# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156**

| | |
|---|---|
| Appellate Court Caption | DINESH J. SHETH, Individually, and GRINDERS INTERNATIONAL, INC., an Illinois Corporation, Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. SAB TOOL SUPPLY COMPANY, an Illinois Corporation, d/b/a Y.G. Tool (USA) Company; Y.G.-1 COMPANY, LTD., Korean Company; Y.G.-1 INDUSTRIES INDIA PRIVATE, LTD., an Indian Company; REGAL CUTTING TOOLS, INC., an Illinois Corporation; and HOKEUN SONG, Individually, Defendants and Counterplaintiffs-Appellees and Cross-Appellants. |
| District & No. | First District, Third Division<br>Docket Nos. 1-11-0156, 1-11-0213 cons. |
| Filed | April 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the parties' contractual relationships in connection with trading in used manufacturing machines, the trial court's decision in favor of defendants was upheld, as was the denial of defendants' motion for an *additur*, but the denial of defendants' motion for prejudgment interest was reversed, since plaintiff was liable for obtaining money through fraudulent misrepresentation and prejudgment interest attaches as a matter of right in such situations. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-2679; the Hon. James McCarthy, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

| Counsel on Appeal | Mark D. Belongia, Michael D. McCormick, and Harry O. Channon, all of Belongia, Shapiro & Franklin, LLP, of Chicago, for appellants. |
|---|---|
| | Barry Levenstam, R. Douglas Rees, and Irina Y. Dmitrieva, all of Jenner & Block LLP, of Chicago, for appellees. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Justices Sterba and Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1   The parties to this appeal were involved in the trade of used manufacturing machines and, before their relationship fell apart, they did about $30 million in business and described each other as brothers. The plaintiffs are Grinders International, Inc., and its principal Dinesh Sheth. Defendants are a group of related companies, Y.G.-1 Company, Ltd., SAB Tool Supply Co., Y.G.-1 Industries India Private, Ltd., and Regal Cutting Tools, Inc., and an individual, Hokeun Song (Song). Y.G.-1 Company (YG-1 Korea) is a Korean company and is the sole shareholder of Y.G.-1 Industries India Private Ltd. (YG-1 India), an Indian corporation. Super Tools Company, Ltd. (Super Tools), is a Korean company and a shareholder of Regal Cutting Tools, Inc. (RCT), an Illinois corporation. SAB Tool Supply Co. (SAB Tool) is an Illinois corporation owned entirely by defendant Song.

¶ 2   Plaintiffs appeal (i) the dismissal of count I of their second amended complaint, and (ii) the results of a joint bench and jury trial. Defendants cross-appeal (i) the trial results, (ii) the admissibility of plaintiffs' expert's testimony, (iii) the order denying their motion for prejudgment interest and *additur*, and (iv) the order granting plaintiffs leave to file a fourth amended complaint at the conclusion of the trial testimony but before the final arguments.

¶ 3   For the reasons stated below, we largely affirm and reverse only as to the trial court's denial of prejudgment interest.

¶ 4                                BACKGROUND

¶ 5   The facts, as developed at trial, are as follows. Grinders' president, Sheth, an engineer by training, began dealing in used manufacturing machinery in 1980 and started Grinders in 1992. Song started YG-1 Korea in 1981. He currently owns 44% of the company and is its chief executive officer. Sheth and Song met in 1999 and started doing business together. Grinders and YG-1 Korea and its subsidiaries conducted between 200 and 250 transactions between 2000 and 2006. Sheth testified that his commission on sales to defendants ranged

from 0% to 10%. Song testified that Sheth's commission ranged from 3% to 10%, depending on the size of the deal. In December 2002, YG-1 Korea formed a subsidiary company in China called New Century Tool.

¶ 6                                  I. Grinders' Sales to YG-1 India

¶ 7        Narendra Mittal began working for defendant YG-1 India in 2002 as a promoter-director, building YG-1 India from the ground up. He later became managing director and then executive director. YG-1 India was almost entirely owned by YG-1 Korea and began operating as a manufacturing company in November 2003.

¶ 8        Grinders began selling manufacturing machines to YG-1 India in late 2003, and Sheth joined YG-1 India as a director. Also at this time, Jayesh Joshi started working as an accounts manager at the company, and within three months he became a director. Joshi's responsibilities included verifying incoming shipments of machinery against invoices and issuing payments for those machines.

¶ 9        Sheth testified that he informed Song that, due to Indian import regulations, used machines Grinders purchased in the United States would have to be reconditioned and rewired before being shipped to India. Sheth testified that Song agreed to fix reconditioning costs at the price of the machine, so that reconditioning costs would not exceed the machines' base price. Song denied making this agreement. Plaintiffs charged YG-1 India for the reconditioning and YG-1 Korea for the machine itself. On December 19, 2003, Mittal sent Sheth an email asking, "Please do not mention that the reconditioning of the machine has been done in the past else we have to quantify the expenses of reconditioning and work out the depreciated value from the year of reconditioning." Sheth testified that he did not list any reconditioning costs on most invoices to YG-1 India to avoid additional custom duties at the Indian border. Sheth testified that YG-1 Korea accepted this arrangement at a YG-1 India board meeting. Song denied the arrangement.

¶ 10       From 2003 to 2005, YG-1 India ordered around 160 machines from Grinders for its factories. YG-1 India paid Grinders about $120,000. Mittal testified that, at the direction of YG-1 Korea, other invoices were not paid. In 2005, Yunkyun Yu, an employee of YG-1 Korea, began overseeing YG-1 India, which was operating at a loss. YG-1 India's financial records showed that it owed money to Grinders. After examining YG-1 India's invoices and invoices paid by YG-1 Korea, Yu concluded that all the equipment Grinders sent to YG-1 India had already been paid for by YG-1 Korea, and that some of shipments to YG-1 India were unauthorized. The invoices for the same equipment billed to both YG-1 India and YG-1 Korea did not refer to the cost of reconditioning the equipment. Yu believed that YG-1 India did not owe Grinders any money. On July 14, 2006, Yu sent a letter of confirmation to Sheth, asking Sheth to confirm that YG-1 India owed Grinders $478,113 for six unpaid invoices, and to transfer all rights to payment under those invoices to SAB Tool. Sheth refused to sign the letter of confirmation.

¶ 11       Mittal estimated that, in November 2006, YG-1 India owed Grinders over $1 million for unpaid machinery invoices. Joshi confirmed that amount. Sheth testified that YG-1 India owed Grinders exactly $1,082,039.84 in unpaid invoices. But Grinders' end-of-year balance

sheet for 2005 reflected only $394,154 in accounts receivable, and the end-of-year balance sheet for 2006 reflected $15,000 in accounts receivable. Sheth stated that he removed money owed from YG-1 India from his books for tax purposes. After Sheth filed this suit, Grinders' books reflected an account receivable from YG-1 India.

¶ 12                                    II. The Besly Transaction

¶ 13     James Deeds served as president and owner of the Besly Products Corporation (Besly), an Illinois company that manufactured cutting tools. In 2004, Deeds decided to sell his company's assets. On August 17, 2005, Sheth informed Song that Besly was interested in selling its cutting tools division. The next day, Sheth informed Song that the asking price for the entire division was $6.7 million, and that the price was $1.2 million more than the cost of the machines alone. Sheth testified that he and Song spoke over the phone on August 17 or 18, and that Song offered to purchase Besly's cutting tools division for $6.5 million. Sheth further testified that Song said, "If you buy it for [$]6.6, you lose money. If you buy [$]6.4, you will get [$]100,000. So it is all your decision. I will pay you [$]6.5." Song denied stating this.

¶ 14     Contrary to Sheth's testimony, he wrote to Song on August 18, 2005, in part, "Mr. Song, I know your goal is to buy for $5.0 million and I will try my best possible to come closer to that figure." Five days later, Sheth again wrote Song, telling him that Besly's asking price was $5.732 million for the machines, inventory, and trademark, or $4.5 million for the machines alone. The next day, Sheth informed Song that he had further negotiated the price down to $5.1 million and was confident he could reduce it further to $5 million. Sheth added:

> "Regarding my commission, please advice [*sic*] on whether it should be billed in the original invoice or sent separately so that we avoid any confusion in accounting at your end.

> The entire transaction in USA with seller will be carried out by Grinders International Inc. This will safeguard us in case of any legal disputes if it ever arises. ***

> I have not prepared any invoice since I do not know under what name you wish to purchase. It will be better if an official purchase order is placed with Grinders International, so we can make proper transaction. Kindly furnish the information so that I can send the invoice. I suggest that in order to avoid any complication like we previously had by listing each and every item on the invoice, it would be recommended that we write

> 'Complete tape manufacturing plant size range _____ to _____ with all equipment attached to all machines' and the price or $5,000,000[.]

> I request you to wire transfer $500,000 at the earliest so that I can sign the papers. I have already given my verbal commitment to the seller."

¶ 15     On August 25, 2005, Sheth sent YG-1 Korea "an invoice detailing standard terms, which I have agreed with the seller of the company. I request you to kinldy [*sic*] study and let me know if you need any additional paper work from my end. I have agreed to make the deposit payment by August 31, 2005." The invoice attached to the August 25, 2005 correspondence

stated, in relevant part, as follows:

| DESCRIPTION | AMOUNT |
| --- | --- |
| A complete tap manufacturing facility consisting of approximately 300+ machines of various types, engineering know-how, inventory and tradename. | $5,000,000 |
| Approximate dismantling, packing and preparing for shipping | $200,000 |
| 3% commission to Grinder International | $150,000 |

Sheth testified that Song asked him to intentionally misrepresent the payment breakdown on this invoice to hide the nature of the transaction from Song's employees. Song denied this. Sheth further testified that Song wished to purchase Besly's raw materials, inventory, and work in progress for himself through SAB Tools. Song denied this as well, claiming that YG-1 Korea already owned those assets after the sale.

¶ 16    Grinders and YG-1 Korea executed a purchase agreement, dated August 27, 2005, for all of Besly's assets at $5 million. Sheth indicated that he "would be signing a similar agreement between Grinder and Besly." YG-1 Korea requested some amendments to the purchase agreement, including making New Century Tool the buyer instead of itself. On August 30, 2005, YG-1 Korea wired $500,000 to Grinders.

¶ 17    At some point, Sheth negotiated his own purchase price down to $3.95 million. Deeds testified that Sheth requested that Deeds not discuss the purchase price with anyone. On August 31, 2005, Besly and Grinders executed a purchase agreement for most of Besly's assets for $3.95 million. On September 6, 2005, YG-1 Korea asked Sheth for a copy of the purchase agreement between Besly and Grinders. Sheth testified that he sent YG-1 Korea a copy of the purchase agreement, and on the same day, he sent an email marked "confidential" to Song. Sheth wrote that, while the contract between Besly and Grinders was, on its face, for $3.95 million, this did not reflect the $50,000 broker fee, and a $1 million promissory note he had made to the sellers "to pay for Trade Name and Engineering" and to satisfy Besly's liability to its employees. Sheth represented that, if the transaction was not structured like this, the bank would take all of the sale proceeds and Besly would remain liable to its employees. Sheth admitted and Deeds confirmed that these representations were false. Sheth testified that Song asked him to misrepresent the Besly's purchase price to hide the nature of the transaction from YG-1 Korea.

¶ 18    In October 2005, Sheth and Song visited the Besly facilities so that Song could assess the condition of Besly's assets. On October 25, 2005, Song sent an email to Sheth, stating that the purchase agreement between New Century Tool and Grinders would be voided and replaced by an agreement between YG-1 Korea and Grinders: "Signed agreements you had already sent to NCT [New Century Tool] will be torn away because we changed the payment mechanic. Instead, we will send the draft for your signature; that is, agreement between GI

[Grinders] and YG[-1 Korea] soon."

¶ 19 On October 28, 2005, YG-1 Korea wired $3.5 million to Grinders, and another $1 million on November 1, 2005. Song attended the closing of the Besly transaction. The parties structured the transaction as a back-to-back purchase and sale. Grinders paid Besly $3.95 million.

¶ 20 After the closing, Song decided to ship Besly's machines to China and transferred other Besly assets in a new company called Besly Cutting Tools, Inc. (BCT), which Song owns. Song made Sheth president of BCT and Yang its chief financial officer. BCT's balance sheet of November 2005 reflects a $1.292 million "officer loan" from Song. Yang testified that amount reflects inventory, raw materials, and work in progress from the Besly transaction, not a cash loan. Sheth testified that BCT purchased these assets from Grinders separate from the back-to-back Besly transaction. Song testified that all of Besly's assets were included in the $5 million purchase price.

¶ 21 According to Sheth, Song orally agreed that BCT would purchase Grinders' raw materials, inventory, and works in progress for $1.293 million. Sheth told the accountant to put the loan on Besly's books, and on November 30, 2005, sent BCT an invoice from Grinders in the amount of $1.293 million for "Finished goods, Semifinished goods, Raw material (steel), Some tooling, Warking [*sic*] progress, Grinding wheels." BCT's balance sheet from November 30, 2005 reflects $1.293 million worth of inventory, but does not show any debt owed Grinders. Nor do Grinders' financial records from that time show any sales to BCT or Song for $1.293 million.

¶ 22 On November 13, 2005, Sheth wrote Song, requesting a purchase order for the Besly transaction. Sheth testified that a purchase order was necessary to clear customs, while Song testified that the purchase order was for shipping purposes only and did not form the basis of the parties' agreement. On November 14, 2005, YG-1 Korea issued a purchase order to Grinder for "Ex-works Besly factory," totaling $5 million and listing 13 pages of various machines and parts. The purchase order did not include Besly's raw materials, inventory, and works in progress.

¶ 23 On December 6, 2005, Song wrote to Sheth asking Sheth to send an offer from BCT to New Century Tools for the purchase of the raw materials and grinding wheels from the Besly transaction. Sheth responded that the purchase should be from Grinders, not BCT. Song responded: "if you want to do transaction between New Century Tool and Grinders International, you can do it only if all invoice amount should be used for payment related with machinery (to New Century Tool from Besly) related cost such as packing." On December 9, 2005, Grinders issued a purchase order to New Century Tool for a shipment of raw materials and grinding wheels from the Besly transaction. The invoice price was $230,834.22. New Century Tool paid this invoice. Song testified that he paid Grinders a commission of $250,000, applied to services done for shipping.

¶ 24 In July 2006, Sheth resigned as BCT's president due to health problems.

¶ 25 III. The Regal-Beloit Transaction

¶ 26 The Regal-Beloit Corporation primarily manufactured motors and generators. In 2005,

Scott Schneier was a group vice president for the mechanical group at Regal-Beloit, where he oversaw the cutting tools division. That division manufactured high-speed rotary tools and had factories in Loris, South Carolina, and South Beloit, Illinois. In 2005, Regal-Beloit decided to sell the cutting tools division and solicited offers from various companies, including Grinders.

¶ 27    On December 6, 2005, Sheth emailed Song seeking authority to negotiate with Regal-Beloit on YG-1 Korea's behalf. The next day, Song authorized Sheth to represent YG-1 Korea in the negotiation. Sheth testified that Song agreed to pay him a 10% commission on the final transaction price. Song denied making an agreement for plaintiffs' commission.

¶ 28    Sheth appraised Regal-Beloit's machines and reached an appraisal value of $18 million. Regal-Beloit's initial asking price was $16 million. After some discussion, Sheth negotiated the price down to about $10.7 million. Sheth performed the due diligence on the acquisition, including providing YG-1 Korea with financial documents, touring Regal-Beloit's factory with Song, and helping to secure $3 million in financing. Sheth also advised Song regarding environmental matters related to the real estate. Song hired Isaac Yang to conduct an asset evaluation of the cutting tools division. Yang testified that when he and Sheth met, Sheth indicated that he was working on the Regal-Beloit transaction for free. Song confirmed this in his testimony. Sheth also retained attorneys to represent YG-1 Korea in the negotiations.

¶ 29    On February 16, 2006, YG-1 Korea sent a letter of intent to Regal-Beloit with a preliminary purchase price of $10.7 million and an initial closing date of March 31, 2006. Song believed the price was too high. Thereafter, Song and his brother, Hosang, negotiated with Schneier directly, and Sheth's was less involved. Song offered to pay $7 million, and Schneier countered with $8.85 million. Regal-Beloit and YG-1 Korea eventually agreed on a price of $7.3 million, with YG-1 Korea taking on some of Regal-Beloit's liabilities, including certain warranties, environmental risks, and employee insurance.

¶ 30    Sheth claims he put forward the idea of creating two companies to act as buyers for the cutting tools division's real estate after the transaction. Song made Yang the owner of these companies. The parties structured the transaction so that defendant RCT acquired the non-real estate assets. The Regal-Beloit transaction closed in May 2006. The closing documents did not give Sheth any commission, and Sheth did not keep track of the number of hours he worked on the transaction. Song testified that had Sheth signed the letter of confirmation regarding Grinders' claims against YG-1 India, he would have paid Sheth $30,000 in commission on the Regal-Beloit transaction.

¶ 31                    IV. Loans Between SAB Tool and Grinders

¶ 32    Heather Lee has been the president of defendant SAB Tool since 1998, which is a wholesaler of cutting tools. Lee testified that, at the direction of Song, who owns the company, SAB Tool loaned money to Grinders, as evidenced by loan agreements signed by Lee and Sheth. Sheth testified that SAB Tools and Grinders loaned money to each other. Lee agreed that SAB Tools loaned money to Grinders, but denied that Grinders ever loaned money to SAB Tools.

¶ 33    In June 2004, Grinders wired $50,000 to SAB Tool. Lee testified that the transfer was

repayment for a loan previously made to Grinders. In January 2005, Grinders wired $80,017 to a bank account at Foster Bank, where SAB Tool has an account. But Lee testified that the second transfer was not to SAB Tool's account. Lee kept a balance sheet for loans to Grinders, which reflected $285,000 in loans and $225,000 in repayments between 2000 and 2008. On the other hand, Sheth's balance sheet showed that Grinders made $415,017 in loans to SAB Tool, and that SAB Tool repaid $285,000.

¶ 34                     V. Egelston's Expert Testimony

¶ 35     Amy Egelston, a certified public accountant and certified fraud examiner, testified as plaintiffs' expert. Egelston examined financial documents, deposition testimony, discovery, and interviewed Sheth. She testified that defendants owed Grinders about $2.39 million and an additional $736,000 in commissions for the Regal-Beloit transaction.

¶ 36     Specifically, Egelston testified that defendants owed $1,082,039.84 for machines sent to YG-1 India and their reconditioning. In arriving at this figure, Egelston relied on Indian import regulations and statutes, which require machines shipped to India to be in working condition. She opined that these regulations required Grinders to recondition all machines it sent to YG-1 India, and to obtain a certificate from an engineer for each machine. Egelston further testified that defendants' claim that Grinders double billed for machines sent to YG-1 India was meritless because Grinders was billing once for the machine and once for the reconditioning. She believed that YG-1 Korea had agreed to pay for the machines and reconditioning based on her reading on some of YG-1 India's corporate minutes (though the minutes do not reference any contract terms) and based on correspondence to YG-1 Korea discussing Grinders' reconditioning expenses. Egelston noted that the reconditioning costs changed over time, so that instead of itemizing charges for each individual repair, Grinders charged defendants once for the sale of the machine and charged the same price for the reconditioning. She testified YG-1 Korea failed to pay for reconditioning of the machines sent to India.

¶ 37     As to the Besly transaction, Egelston testified that YG-1 Korea owed Grinders $1,062,165.78. She acknowledged that Grinders purchased Besly's assets for $3.95 million. Based on YG-1 Korea's purchase order, Egelston concluded that YG-1 purchased Besly's machines from Grinders for $5 million, but excluded Besly's inventory, raw materials, and work in progress. She stated that YG-1 Korea was supposed to pay $1.2 million for the rest of Besly's assets, but never did. Instead, she asserted that Grinders transferred the remainder of Besly's assets to Song's company, Besly Cutting Tools, without payment. As to Grinders' interaction with SAB Tool, Egelston testified that Grinders had loaned SAB Tool $130,017 and had never been repaid those loans.

¶ 38                             VI. Judgment

¶ 39     The jury returned a verdict on plaintiffs' fourth amended complaint and defendants' amended counterclaims, in relevant part, as follows:

      • judgment in favor of plaintiffs on count I of the fourth amended complaint (unpaid reconditioning fees on machines sent to YG-1 India) in the amount of $1,082,039.84, and

a finding that the delay in payment was unreasonable and vexatious;

> • judgement in favor of defendants on counts IV (loans to SAB Tool), and V (for the unpaid balance in the Besly transaction);

> • judgment in favor of defendants on count I of defendants amended counterclaim (fraud in the Besly transaction) in the amount of $300,000 with no assessment of punitive damages.

As to the bench trial portion, the court returned a judgment in favor of defendants on count VI of plaintiffs fourth amended complaint, where plaintiffs sought to recover in *quantum meruit* for their part in the Regal-Beloit transaction.

¶ 40                                   STANDARD OF REVIEW

¶ 41    We will reverse the trial court's findings following a bench trial if they are against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. The same standard applies to our review of a jury's verdict. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). "[A] jury's verdict is not contrary to the manifest weight of the evidence when the evidence is conflicting and the jury resolved the conflict." *Templeton v. Chicago & North Western Transportation Co.*, 257 Ill. App. 3d 42, 54 (1993).

¶ 42                                         ANALYSIS

¶ 43    Plaintiffs' appeal and defendants' cross-appeal raise numerous issues. The court will address each in turn.

¶ 44                            I. Illinois Business Brokers Act

¶ 45    Plaintiffs appeal the circuit court's dismissal of count I of their second amended complaint under section 2-619 of the Code of Civil Procedure (Code). 735 ILCS 5/2-619(a) (West 2010). Count I of that complaint alleged breach of an oral contract against defendants Song, YG-1 Korea, Super Tools, SAB Tools, and RCT, and sought a commission for plaintiffs' role in the Regal-Beloit transaction. The trial court dismissed this claim, holding that plaintiffs failed to comply with the writing requirement of the Illinois Business Brokers Act of 1995 (Business Brokers Act) (815 ILCS 307/10-1 *et seq.* (West 2010)).

¶ 46    In granting a section 2-619 motion to dismiss, the court disposes of issues of law and easily proven issues of fact at the outset of litigation. *Glasgow v. Associated Banc-Corp*, 2012 IL App (2d) 111303, ¶ 12. A section 2-619(a) motion admits the legal sufficiency of a complaint, but asserts affirmative matter outside the pleadings that defeats a cause of action. *CNA International, Inc. v. Baer*, 2012 IL App (1st) 112174, ¶ 29. For the purposes of a section 2-619 motion, the court takes as true all well-pleaded facts and associated inferences, and considers whether a genuine issue of fact precludes dismissal or whether a claim may be dismissed as a matter of law. *Glasgow*, 2012 IL App (2d) 111303, ¶ 12. This

court reviews a ruling on a motion to dismiss *de novo*. *CNA International*, 2012 IL App (1st) 112174, ¶ 29. We affirm the dismissal of count I of plaintiffs' second amended complaint.

¶ 47    In their second amended complaint, plaintiffs alleged that on December 5, 2005, Regal-Beloit informed Sheth that it wanted to sell its cutting tools division. Sheth passed this information along to Song in an email that stated, in relevant part, that the president of Regal-Beloit

> "has shown interest in *selling his entire business* in USA *** if we will continue operating, manufacturing and seeling [*sic*] under theior [*sic*] brand name. At present the company sales volume is $16 Million. *Their headquarters is located in South Beloit, IL.* In South Beloit they manufacture taps and in South Carolina they manufacture drills." (Emphases added.)

Song authorized Sheth to proceed with negotiations. At the time, the parties intended the purchaser to be Super Tools, YG-1 Korea, or a later-incorporated affiliate. Sheth negotiated the purchase price and incorporated RCT as a wholly owned subsidiary of YG-1 Korea to act as the buyer. On May 5, 2006, RCT purchased Regal-Beloit's cutting tools division for $7.36 million. Based on the parties' past dealings, plaintiffs requested a 10% commission, which defendants refused.

¶ 48    The Business Brokers Act defines a "business broker" as (i) "any person who is required to register under Section 10-10 of [the] Act" and (ii) "in return for a fee, commission, or other compensation:"

> "(1) promises to procure a business for any person or assists any person in procuring a business from any third person;
>
> (2) negotiates, offers, attempts or agrees to negotiate the sale, exchange, or purchase of a business;
>
> (3) buys, sells, offers to buy or sell or otherwise deals in options on businesses;
>
> (4) advertises or represents himself as a business broker;
>
> (5) assists or directs in the procuring of prospects intended to result in the purchase, sale, or exchange of a business;
>
> (6) offers, promotes, lists or agrees to offer, promote, or list a business for sale, lease, or exchange." 815 ILCS 307/10-5.10 (West 2010).

The Business Brokers Act defines a "business" as

> "an existing business, goodwill of an existing business, or any interest therein, or any one or combination thereof, where the transaction is not a securities transaction involving securities subject to the Illinois Securities Law of 1953 [(815 ILCS 5/1 *et seq.*)], and wherein the sale or exchange of real estate is not the dominant element of the transaction." 815 ILCS 307/10-5.15 (West 2010).

¶ 49    The Business Brokers Act applies "when the person engaging or seeking to engage the business broker is domiciled in this State or when the company or business sought to be sold has its principal place of business in this State." 815 ILCS 307/10-105 (West 2010). An entity is considered domiciled in its principal place of business and its place of incorporation. 14 Ill. Adm. Code 140.51 (2001). A contract for business brokerage services must be in

writing and signed by the parties. 815 ILCS 307/10-35 (West 2010). Business brokers must disclose certain information to their clients in their contracts for services and maintain certain records. 815 ILCS 307/10-30, 10-30.5, 10-75 (West 2010). Any contract subject to and in violation of the Business Brokers Act is void. 815 ILCS 307/10-60 (West 2010).

¶ 50   Plaintiffs argue that the Regal-Beloit transaction was not subject to the Business Brokers Act because (1) the transaction involved the purchase of business assets and not an entire business, and (2) neither Song nor Regal-Beloit was domiciled in Illinois. Song is a citizen and resident of South Korea, and Regal-Beloit is incorporated and has its principal place of business in Wisconsin. RCT, the ultimate buyer in the transaction, was formed months after Sheth initiated negotiations.

¶ 51   The first issue, whether plaintiffs acted as a "business broker" with regard to the Regal-Beloit transaction, is a matter of statutory construction. In interpreting a statute, we ascertain and give effect to the legislature's intent as it is found in the plain and ordinary meaning of statute's language. *Stoelting v. Betzelos*, 2013 IL App (2d) 120651, ¶ 13.

¶ 52   Based on the allegations of the second amended complaint, plaintiffs acted as a "business broker" with regard to the Regal-Beloit transaction. Under the Business Brokers Act, a "business broker" is defined as (i) one "engaging in the business of business brokering" (815 ILCS 307/10-5.10, 10-10 (West 2010)), and (ii) one who takes compensation for, among other things, "promis[ing] to procure a business for any person or assist[ing] any person in procuring a business from any third person" (815 ILCS 307/10-5.10(1) (West 2010)). A "business" includes "an existing business, goodwill of an existing business, or any interest therein, or any one or combination thereof." 815 ILCS 307/10-5.15 (West 2010). (Neither party argues that the Business Brokers Act's exceptions to the definition of a "business"–securities transactions and real estate transactions–apply.) As Sheth noted in his December 2005 email to Song, the transaction included the business's goodwill in the form of Regal-Beloit's brand name. Thus, for the Regal-Beloit transaction, plaintiffs acted as a business broker. See 815 ILCS 307/10-5.10(1), 10-5.15 (West 2010).

¶ 53   The next issue is whether defendants fall within the scope of the Business Brokers Act. The Business Brokers Act applies when the corporate client seeking business brokerage services has its principal place of business or its place of incorporation in Illinois. 815 ILCS 307/10-105 (West 2010); 14 Ill. Adm. Code 140.51. Plaintiffs allege that Song engaged them on the Regal-Beloit transaction. Regardless of whether Song engaged plaintiffs in his individual capacity or as a corporate agent for YG-1 Korea or Super Tools, neither is domiciled in Illinois. Defendants argue that the buyer, RCT, is the relevant entity. We disagree. Under section 10-105, application of the Business Brokers Act depends on who engaged the business broker, not the buyer's identity.

¶ 54   The Business Brokers Act also applies "when the company or business sought to be sold has its principal place of business in this State." 815 ILCS 307/10-105 (West 2010). Again, the term "business" includes "an existing business, goodwill of an existing business, or any interest therein, or any one or combination thereof." 815 ILCS 307/10-5.15 (West 2010). While it is illogical to ask where Regal-Beloit's goodwill is located, the real estate and real property were located in Illinois and South Carolina, and Sheth represented in his December

-11-

2005 email that Regal-Beloit was headquartered in Illinois. Thus, the plaintiff alleged that the cutting tools division had its principal place of business in Illinois, and the Business Brokers Act applied to the Regal-Beloit transaction.

¶ 55    Accordingly, the trial court properly dismissed count I of plaintiffs' second amended complaint.

¶ 56                    II. *Quantum Meruit* and the Regal-Beloit Transaction

¶ 57    Plaintiffs appeal the trial court's judgment in favor of defendants on count VI of plaintiffs' fourth amended complaint, seeking to recover in *quantum meruit* against Song, YG-1 Korea, Super Tools, SAB Tool, and RCT for unpaid commissions from the Regal-Beloit transaction. We will reverse the trial court's findings if they are against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. We affirm.

¶ 58    The parties present four issues under count VI: (i) whether plaintiffs' *quantum meruit* claim is barred by the Business Brokers Act (815 ILCS 307/10-1 (West 2010)), or the Real Estate License Act of 2000 (Real Estate License Act) (225 ILCS 454/1-1 *et seq.* (West 2010)) or whether those arguments are waived; (ii) whether defendants judicially admitted during opening statements and closing arguments that plaintiffs were due a commission from the Regal-Beloit transaction; (iii) whether plaintiffs sustained their burden at trial of proving the reasonable value of their services; and (iv) whether this court can award damages and prejudgment interest.

¶ 59    Defendants argue that count VI was barred by the Business Brokers Act and the Real Estate License Act (225 ILCS 454/1-1 *et seq.* (West 2010)). Plaintiffs respond that these arguments are waived because defendants did not raise these issues before the trial court. We agree. This court may deem any arguments not raised in the trial court as waived or forfeit on appeal. *Mann v. Thomas Place, LP*, 2012 IL App (1st) 110625, ¶ 15. Before the trial court, defendants, in their posttrial bench memorandum failed to raise any defense under the Business Brokers Act or Real Estate License Act. Instead, defendants argued that plaintiffs (i) failed to establish a *quantum meruit* claim, and (ii) failed to establish the reasonable value of their services in the Regal-Beloit transaction. Accordingly, we hold that defendants waived their arguments regarding the Business Brokers Act and Real Estate License Act for purposes of appeal.

¶ 60    Plaintiffs next argue that defendants admitted in their opening statement and closing argument that defendants owe plaintiffs a commission for the Regal-Beloit transaction and that these constitute binding judicial admissions. We disagree. Where a party makes "a clear, unequivocal statement about a concrete fact within that party's particular knowledge" in opening statements or closing argument, those statements constitute binding judicial admissions. *Stamp v. Sylvan*, 391 Ill. App. 3d 117, 126 (2009). For example, in *Lowe v. Kang*, 167 Ill. App. 3d 772 (1988), the defense counsel admitted to liability in closing argument. *Id.* at 778 (quoting defense counsel arguing " 'There is no question that there was fault on the part of both parties to this occurrence.' "). Here, defendants made the following statement in their opening:

"Mr. Belongia [plaintiffs' counsel] said there was an agreement for a 10 percent commission, as counsel pointed out. Certainly there was [*sic*] dollar signs in Mr. Sheth's eyes and [he] let that get the better of him. *** Mr. Sheth was looking out for his own interest [in the Regal-Beloit transaction]. He wanted a higher purchase price because he was assuming he was going to get a commission based on that deal."

These statements, parroting plaintiffs' argument and pointing out its underlying assumptions, are not clear, unequivocal statements about concrete facts. Similarly, in their closing arguments, defendants stated as follows:

"You can't both buy and sell, make a profit and take a commission. If you're being paid a commission, you're supposed to put in all of your effort into assisting the person who's paying you commission.

You're not supposed to make a profit yourself, but that's what Mr. Sheth is trying to do, and its inconsistent with the evidence in this case.

The evidence is that from the beginning, Mr. Sheth would find some equipment. He would call Mr. Song, say, 'I found this equipment. I need $500,000.'

YG-1 would wire the $500,000. You saw all the wires. The material would be shipped, and a commission would be paid perhaps, usually. It wasn't always 10 percent. Sometimes it was less.

***

In fact, Mr. Sheth makes his earnings based on commissions. And so even if he bought–when he bought for YG-1 at a certain price, that YG-1 paid, he did make money because he made a commission 5, 10 percent on $30 million."

While defendants' counsel states that plaintiffs were usually paid on a commission, these statements are not clear, unequivocal statements that Sheth is due a commission for the Regal-Beloit transaction. Accordingly, we find no judicial admissions.

¶ 61    Moreover, we hold that plaintiffs failed to prove at trial the reasonable value of their services in the Regal-Beloit transaction. Plaintiffs argue that they met their burden proving every element of their *quantum meruit* claim. In support, they cite to the following facts: (i) Song authorized Sheth to represent Song and his entities in the Regal-Beloit transaction; (ii) Sheth testified that Song promised a 10% commission on the transaction; (iii) Sheth provided valuable services in brokering the transaction; (iv) defendants failed to pay Sheth for those services; and (v) Song admitted that he would have paid Sheth $30,000 for his work.

¶ 62    Defendants respond that plaintiffs failed to prove the reasonable value of their work at trial, relying on *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961 (2010). There, two lawyers in a firm decided to form their own practice, and after a dispute arose on how to split the fees on their current cases, one lawyer sued the departing partners. *Id.* at 963-65. The trial court awarded the plaintiff 10% of the attorney fees in *quantum meruit*. *Id.* at 966. On review, the *quantum meruit* award was reversed as against the manifest weight of the evidence. *Id.* at 980. At trial, the evidence showed that the plaintiff's contribution was limited to bringing cases into the firm, speaking with clients and adjustors, and working on interrogatories. *Id.* The plaintiff introduced no evidence regarding the

amount of time he worked on cases or the hourly rate he charged for his services. *Id*. Thus, the court held that the plaintiff failed to "introduce some evidence specific enough to prove the reasonable value of the benefit [the defendant] allegedly received." *Id.* at 979. Defendants argue that–like the attorney in *Bernstein & Grazian*–Sheth failed to introduce sufficient evidence of the value of his services.

¶ 63 In reply, plaintiffs argue that they did not need to submit evidence of the number of hours Sheth spent on the Regal-Beloit transaction because brokers are not paid by the hour, but on commission. See *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1043 (1988) ("Unlike cases involving attorney fees [citation], *quantum meruit* recovery in real estate broker's commission cases may be based on a percentage of the sales price [citations].") In *Romanek-Golub*, the plaintiff broker provided expert testimony on the standard broker's fee for Chicago-area commercial real estate brokers. *Id*. Plaintiffs assert that they established the reasonable value of their services through Sheth's testimony that Song agreed to pay plaintiffs a 10% commission. See *Ellis v. Photo America Corp.*, 113 Ill. App. 3d 493 (1983) (permitting *quantum meruit* recovery where defendant proposed commission formula during negotiations, and trial court's use of formula supported by record). Plaintiffs contend that Sheth, like the plaintiff in *Ellis*, is entitled to compensation as contemplated under the parties' agreement.

¶ 64 We hold that the trial court's judgment was not against the manifest weight of the evidence. To recover in *quantum meruit*, Sheth was required to present "evidence specific enough to prove the reasonable value of the benefit" defendants received. *Bernstein & Grazian*, 402 Ill. App. 3d at 979. While we agree, that Sheth need not present an invoice of his work on an hourly basis, he did need to introduce some basis as to how his commission should have been calculated. For example, he could have provided expert testimony as to a standard broker's fee in transactions like the Regal-Beloit deal, like the broker in *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d at 1043. Or Sheth could have introduced evidence of his commissions on deals similar in size and complexity to this one. Instead, the trial judge heard conflicting testimony (including testimony that Sheth agreed to work without commission) and weighed their credibility. Moreover, unlike *Ellis*, where the parties agreed on a commission formula but never formed a contract, here defendants denied ever agreeing to give plaintiffs a 10% commission. Accordingly, it was within the province of the trial court to find that no agreement was ever made. Given the evidence before the trial court, the judgment in favor of defendants on count VI was not against the manifest weight of the evidence.

¶ 65 In affirming the lower court's judgment on count VI, no damages are due to plaintiffs under that count. Thus, we decline to address the arguments regarding plaintiffs' request to this court for damages and prejudgment interest.

¶ 66 III. Breach of an Oral Contract and Fraud in the Besly Transaction

¶ 67 Plaintiffs appeal the jury's verdict in favor of defendants on count V of plaintiffs' fourth amended complaint and count I of defendants' amended counterclaim, both relating to the same transaction. In count V, plaintiffs alleged breach of an oral contract against YG-1 Korea

and Song, and sought $1,102,695.78 in unpaid funds for the Besly transaction. In count I of their amended counterclaim, defendants alleged that Sheth committed fraud against YG-1 Korea by misrepresenting the sale price in the Besly transaction. Reversal is mandated only if the jury's verdict is against the manifest weight of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). We affirm.

¶ 68 The elements of a cause of action for breach of a contract, whether oral or written, "include the existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and resultant damages or injury to the plaintiff." *Razor Capital v. Antaal*, 2012 IL App (2d) 110904, ¶ 30. A valid and enforceable contract requires an offer, an acceptance, and consideration. *CNA International, Inc. v. Baer*, 2012 IL App (1st) 112174, ¶ 45.

¶ 69 As to count I, plaintiffs argue that they proved at trial all the elements for breach of an oral contract. In support, they cite Sheth's testimony that the parties had an oral agreement regarding the Besly transaction. First, Grinders would purchase Besly's for $3.95 million. Second, defendants would purchase Besly's assets from Grinders, paying about $6.5 million for all of Besley's assets, including (i) $5 million for the machines, as noted in a purchase order from YG-1 Korea, (ii) $1.293 million for inventory, raw materials, and work in progress, and (iii) $250,000 for dismantling the purchased machinery. Plaintiffs argue that the parties intended the difference between the Grinder's purchase price and sale price of the Besly assets was commission. Plaintiffs point to the payment of $230,834.22 by YG-1 Korea after the initial $5 million payment on the Besly transaction as evidence that $5 million did not cover the entire transaction. Moreover, plaintiffs point to Song's taking a $1.293 million loan from his company to pay for the remainder of the Besly transaction. Plaintiffs also argue that Sheth did not agree to work for free on the Besly transaction and that Song's testimony that Besly earned a $250,000 commission on the transaction was incorrect.

¶ 70 Defendants counter that there was substantial evidence that YG-1 Korea did not agree to pay $6.5 million on the deal. Defendants note that, contrary to Sheth's testimony, Song denied agreeing over the phone to pay $6.5 million for Besly's assets. Defendants further point to the fact that the parties executed a purchase agreement for the Besly transaction, which lists $5 million as the price for the entire transaction.

¶ 71 As to the BCT loan, defendants respond that this was an inventory transfer from one of Song's companies to another. Defendants argue that they presented evidence that the BCT loan was not done for the purpose of paying Grinders for the Besly transaction. As to YG-1 Korea's payment of about $230,000, defendants point to evidence that the payment was not to plaintiffs but to BCT, as a way of infusing the new company with cash. Defendants conclude that the payment was therefore not evidence that the $5 million did not cover the entire Besly transaction. Defendants conclude that, given the contradictory evidence before the jury, the verdict on count V was not against the manifest weight of the evidence.

¶ 72 Given the contradictory evidence before the jury, their verdict on count V of plaintiffs' fourth amended complaint was not against the manifest weight of the evidence. Plaintiffs presented evidence, largely in the form of Sheth's testimony, that Song in mid-August 2005 agreed to purchase Besly's cutting tools division for $6.5 million, regardless of what

plaintiffs paid. Song denied this, and correspondence between him and Sheth corroborates that Song did not offer to pay $6.5 million for Besly's assets. Moreover, the jury heard evidence that the parties agreed, on August 27, 2005, that defendants would purchase all the Besly assets for $5 million. Sheth admitted this but testified that the defendants were later willing to purchase the machines alone for $5 million, and wanted to pay an extra $1.5 million for Besly's remaining assets, even though they would not have had to do so under the August 27 agreement. Given the conflicting evidence regarding the existence of an oral contract, the jury's verdict against plaintiffs and in favor of defendants on count V of the fourth amended complaint was not against the manifest weight of the evidence.

¶ 73    As to count I of the amended counterclaim, plaintiffs argue that Sheth fully disclosed the $3.95 million purchase price and that their expert opined that Sheth did not commit fraud. They also contend that defendants failed to prove fraud by clear and convincing evidence.

¶ 74    We find that the jury's verdict on count I of the amended counterclaim was not against the manifest weight of the evidence. The elements of common law fraud are (i) a false statement or omission of material fact; (ii) knowledge or belief of the falsity by the party making it; (iii) intention to induce the other party to act; (iv) action by the other party resulting in reliance on the truth of the statements; and (v) damage to the other party resulting from such reliance. *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452 (1989); *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087 (2010).

¶ 75    Sheth admitted that he intentionally misrepresented the price of the Besly transaction as $5 million. Sheth again lied when he represented that Grinders' $3.95 million purchase price did not reflect $1.05 million in hidden costs. Sheth testified that Song asked him hide the nature of the transaction from YG-1 Korea. But it was within the province of the jury to disbelieve Sheth. Given the contradictory evidence presented, the jury's verdict on count I of defendants' amended counterclaim is not against the manifest weight of the evidence.

¶ 76                    IV. Breach of Contract and Loans to SAB Tool

¶ 77    Plaintiffs appeal the jury's verdict in favor of defendants on count IV of plaintiffs' fourth amended complaint. In count IV, Grinders alleged that it loaned SAB Tool $130,017, which SAB Tool failed to repay. We review the verdict under the manifest weight of the evidence standard. We affirm.

¶ 78    As noted above, the elements of breach of a contract are a valid and enforceable contract, the plaintiff's performance, the defendant's breach, and resultant damages to the plaintiff. *Razor Capital v. Antaal*, 2012 IL App (2d) 110904, ¶ 30. A contract requires offer, acceptance, and consideration. *CNA International*, 2012 IL App (1st) 112174, ¶ 45.

¶ 79    Plaintiffs argue that all the evidence at trial, including plaintiffs' expert, showed that Grinders wired $130,017 to SAB Tool and that these payments were not related to any invoice. Defendants respond that the only evidence of these transactions was the wire transfers themselves, one of which did not have SAB Tool's account number. Defendants also note that SAB Tool's president testified that one of the transfers was a repayment of Grinder's outstanding debt to SAB Tool. Defendants point to Sheth's testimony that Grinders would often ask for loans from Song, and that they often executed a written loan agreement,

but here did not.

¶ 80　　The jury's verdict in favor of defendants on count IV is not against the manifest weight of the evidence. Heather Lee, SAB Tool's president, testified that her company loaned money to Grinders, as evidenced by signed loan agreements. Lee denied that Grinders ever loaned money to her company. In contrast, Sheth testified that SAB Tools and Grinders loaned money to each other. Given the contradictory testimony before the jury, their verdict was not against the manifest weight of the evidence.

¶ 81　　　　　　　　　　　　V. *Additur*, Damages, and Prejudgment Interest

¶ 82　　Defendants cross-appeal the damages award under count I of their amended counterclaim, which alleged fraud in the Besly transaction. They raise two issues. First, that the trial court erred in denying defendants' posttrial motion for a $750,000 *additur* and that this court should, at least, remand the case for a new trial on damages. Second, that the trial court erred in denying defendants' request for prejudgment interest on Sheth's profit in the Besly transaction. We review the trial court's grant or denial of a new trial or an *additur* or *remittitur* for an abuse of discretion. See *Martinez v. Elias*, 397 Ill. App. 3d 460, 474 (2009).

¶ 83　　Courts are rightfully reluctant to interfere with a jury's calculation of damages. But "where a verdict is legally inconsistent, it should be set aside." *Galloway v. Kuhl*, 346 Ill. App. 3d 844, 849 (2004). Where a jury has erred in its calculation of damages, the court has three options: a new trial, a new trial on damages, or an *additur*. The circuit court can order a new trial on liability and damages (i) if the damages awarded in the previous trial are " 'manifestly inadequate,' " or (ii) if proven elements of damages were ignored or do not present a reasonable relationship to the amount of damage incurred. *State Farm Mutual Insurance Co. v. Ellison*, 354 Ill. App. 3d 387, 390 (2004). Or the circuit court can order a new trial limited to the issue of damages where (i) the jury's verdict on liability is amply supported by the evidence, (ii) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant, and (iii) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability. *Id*.

¶ 84　　In other cases, an *additur* may be used to correct an omission of a liquidated damages or an easily calculated item of damage. *Id.* at 391. Moreover, where the jury makes credibility determinations based on conflicting testimony, an *additur* is unavailable. *Poliszczuk v. Winkler*, 387 Ill. App. 3d 474, 497 (2008). "*Additur* is appropriate only to rectify the omission of a liquidated or easily calculated item of damages when the evidence warrants it." *Id*. (quoting *Hladish v. Whitman*, 192 Ill. App. 3d 561, 565 (1989)); *Galloway v. Kuhl*, 346 Ill. App. 3d at 849 (holding *additur* appropriate where verdict inadequate due to omission of "specific, definitely calculable item"). "Because *additur* is essentially a conditional ruling on a motion for a new trial, the trial court should consider whether, beyond the criteria for *additur*, grounds for a new trial otherwise exist." *Merrill v. Hill*, 335 Ill. App. 3d 1001, 1006 (2002).

¶ 85　　Defendants contend that Illinois law requires Sheth to disgorge all ill-gotten profits from

the Besly transaction. In support they cite and discuss three cases: *Kirkruff v. Wisegarver*, 297 Ill. App. 3d 826 (1998); *Spindler v. Krieger*, 16 Ill. App. 2d 131 (1958); and *Sams v. Rigg*, 339 Ill. App. 25 (1949).

¶ 86    In *Kirkruff v. Wisegarver*, the plaintiffs sued their defendant real estate broker for breach of fiduciary duty and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, among other things. *Kirkruff*, 297 Ill. App. 3d at 828-29. At trial, the jury returned a verdict for the plaintiffs and awarded $58,200 on plaintiff's fiduciary duty claim. *Id.* at 829. The trial court granted plaintiffs an *additur* and increased the damages to $90,324.74, the amount of the defendant's net profits on the transaction. *Id.* On appeal, the court upheld the additional damages, holding that once the jury found the defendant liable for breaching his fiduciary duty as plaintiffs' agent, damages were fixed at the amount of his net profit on the transaction. *Id.* at 837.

¶ 87    In *Spindler v. Krieger*, the plaintiff retained the defendant real estate broker to acquire a parcel of land for $32,000. *Spindler*, 16 Ill. App. 2d at 133-34. The defendant acquired the land himself for $26,500 and then sold it to the plaintiff for a $5,500 profit. *Id.* at 135-36. The plaintiff sued for an accounting. *Id.* at 133. The trial court found the defendant liable, and the appellate court agreed, holding that an agent is barred from making secret profits made at the principal's expense. *Id.* at 146-47. The holding in *Sams v. Rigg*, 339 Ill. App. 25, 33 (1949), is the same as in *Spindler*.

¶ 88    As an example of a case where the appellate court ordered an *additur*, defendants cite *ABC Trans National Transportation, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817 (1980). There, the trial court ordered the defendants to forfeit one-third of their salaries during the time they were breaching their fiduciary duties to the plaintiff. *Id.* at 837. The appellate court increased the damages award to a full forfeiture of the defendants' salaries during the time of their breaches. *Id.* at 838. The court specifically held that "an agent is entitled to compensation only on a due and faithful performance of all his duties to his principal," and that "it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal." (Emphasis omitted; internal quotation marks omitted.) *Id.* at 837. Accordingly, during the time in which an agent breaches his or her fiduciary duty, a complete forfeiture of the agent's salary is required as a matter of public policy. *Id.* at 838. The court did not remand the case for further proceedings on damages because the increase in damages were easily calculated. *Id.* at 838-39.

¶ 89    Applying these principles, defendants argue that Sheth should be required to forfeit his entire profit from the Besly transaction as damages for his fraudulent conduct. They note that the amount of damages is easily calculable as the difference in the amount Sheth paid to acquire Besly ($3.95 million) and the amount defendants paid ($5 million)–$1.05 million. They assert that this court should order an *additur* or remand the case for a new trial on damages under count I of their amended counterclaim.

¶ 90    We find the trial judge did not abuse his discretion in denying defendants' motion for an *additur*. An *additur* is appropriate to correct an omission of easily calculated damages. But

-18-

defendants' counterclaim was for fraud, and all of defendants' cases involve a breach of fiduciary duty and are thus distinguishable. Damages for fraud are typically calculated using the benefit-of-the-bargain rule, where the plaintiff's recovery is limited to an amount needed to compensate for the loss occasioned by the fraud. *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 285 Ill. App. 3d 201, 212 (1996); *Tan v. Boyke*, 156 Ill. App. 3d 49, 55 (1987) ("In an action for fraud, consequential damages proximately resulting from the fraud are recoverable." (Internal quotation marks omitted.)).

¶ 91 The defendants' damages are not easily calculable as it is unclear what they would have paid absent Sheth's false statements. Defendant's theorize that, if not for Sheth's fraud, they would have paid no commission. This conclusion is not supported by the record, as Song testified that he often paid Sheth a commission and reimbursed his expenses. Defendants did not put on evidence as to how much Sheth's commission should have been on the Besly transaction. Without that evidence, damages in this case are not easily calculable, and an *additur* is inappropriate.

¶ 92 Similarly, as to the issue of a new trial on damages, we find that the trial court did not abuse its discretion in denying defendants' motion. A new trial on damages is appropriate where the jury's award is manifestly inadequate, or the jury ignored proven elements of damages, or the jury's award was not reasonably related to the amount of damages incurred. *Ellison*, 354 Ill. App. 3d at 390. With fraud, "[a]bsolute certainty about the amount of damage is not necessary to justify a recovery if damage is shown, but damages may not be predicated on mere speculation, hypothesis, conjecture or whim. [Citation.] Moreover, the evidence must show a basis for computing damages with a fair degree of probability." (Emphasis omitted; internal quotation marks omitted.) *Dloogatch v. Brincat*, 396 Ill. App. 3d 842, 851 (2009).

¶ 93 Because defendants did not present at trial an alternative basis for computing their damages, they cannot complain post trial that the jury's award was somehow incorrect. Defendants had the burden of presenting evidence and argument as to how their damages should be calculated. In their closing arguments, defendants asked the jury to return a $1.05 million verdict on their fraud counterclaim, essentially arguing for a forfeiture. Because forfeiture is not a proper calculation of fraud damages, the jury could disregard defendants' argument.

¶ 94 In cases like this, where fraud resulted in an inflated sale price, the proper calculation for damages is the difference between what the defrauded party paid and what it would have paid had there been no fraud. See *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 760-61 (1993) (holding recovery under fraud is for "what would have occurred 'but for the fraud' "). At trial, defendants proved that they paid an inflated price in the Besly transaction. But they did not prove the amount of the inflation. In other words, they failed to present evidence as to what they would have paid absent Sheth's fraud. Without such evidence or argument before the jury, there was no basis for saying that the award is manifestly inadequate, or that the jury ignored proven elements of damages, or the award is not reasonably related to the amount of damages incurred.

¶ 95 Defendants further appeal the trial court's denial of their motion for an award of

prejudgment interest under section 2 of the Illinois Interest Act. Plaintiffs have not responded to this portion of the appeal. The decision to allow or deny statutory interest lies within the sound discretion of the circuit court, and this court will not disturb that decision absent an abuse of discretion. *Bank of Chicago v. Park National Bank*, 266 Ill. App. 3d 890, 900 (1994). "[A] court abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and judgment and ignores recognized principles of law." (Internal quotation marks omitted.) *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 121. We reverse.

¶ 96        Generally, a party has no right to recover prejudgment interest unless permitted by statute or contract. *City of Peoria Municipal Employees Ass'n v. City of Peoria*, 217 Ill. App. 3d 550, 556 (1991). The purpose of an award of prejudgment interest is to fully compensate the injured party for the monetary loss suffered. *Milligan v. Gorman*, 348 Ill. App. 3d 411, 416 (2004). The portion of the Illinois Interest Act that defendants rely on states, "Creditors *shall* be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due *** on money received to the use of another and retained without the owner's knowledge." (Emphasis added.) 815 ILCS 205/2 (West 2010). The Northern District of Illinois has interpreted this 122-year-old statute to include money paid as a result of fraud (see *Marcus & Millichap Real Estate Investment Services Inc. v. Sekulovski*, No. 07 C 5369, 2010 WL 145785 (N.D. Ill. Jan. 12, 2010) (awarding prejudgment interest under section 2 where defendant misappropriated and inflated commissions, and hid deals from plaintiff employer)) and converted funds (see *Brulin & Co. v. Higgins*, No. 85 C 10522, 1987 WL 10304 (N.D. Ill. Apr. 30, 1987)). Those interpretations are consistent with the Illinois Supreme Court's reading of the statute. See *Whittemore v. People*, 227 Ill. 453, 474-75 (1907) ("interest will be allowed as a penalty where money has been secured and retained by a tortious act and where it has been fraudulently taken and its conversion concealed"); *Currier v. Kretzinger*, 162 Ill. 511, 515-16 (1896) (allowing interest for unlawfully concealing and retaining funds where contract called for division of profits). If the requirements of section 2 are satisfied, prejudgment interest attaches as a matter of law. *Tomaso v. Plum Grove Bank*, 130 Ill. App. 3d 18, 29 (1985) (citing difference portion of section 2).

¶ 97        Defendants assert that the circuit court had no discretion to deny an award of prejudgment interest. They argue that Sheth's secret profit on the Besly transaction constituted "money received to the use of another and retained without the owner's knowledge." As an example, defendants cite *Chicago Title & Trust Co. v. First Arlington National Bank*, 118 Ill. App. 3d 401 (1983). In that case, the court cited a different provision of section 2 of the Interest Act, which permitted prejudgment interest in cases involving "an unreasonable and vexatious delay of payment" by a debtor. (Internal quotation marks omitted.) *Id.* at 412. The court held that "this portion of section 2 has been interpreted as providing that where property has been wrongfully taken, or converted into money, and an action of trespass or trover may be maintained, interest may properly be recovered." *Id.* (quoting *Illinois Central R.R. Co. v. Cobb, Blaisdell & Co.*, 72 Ill. 148, 153 (1874)). The court concluded that an "an action to recover funds which were obtained by tortious

misrepresentation" constituted an unreasonable and vexatious delay of payment. *Id*. Plaintiffs do not respond to defendants arguments regarding prejudgment interest.

¶ 98    We typically accord deference to the trial court's decision in awarding or withholding prejudgment interest, but the Interest Act "mandates prejudgment interest, as a matter of right" in certain situations. *Milligan v. Gorman*, 348 Ill. App. 3d 411, 416 (2004). Where a party is liable for obtaining funds through fraudulent misrepresentaiton, prejudgment interest attaches as a matter of right from the date of payment as "money received to the use of another and retained without the owner's knowledge." 815 ILCS 205/2 (West 2010). The trial court erred in denying defendants motion for prejudgment interest. Accordingly, we reverse and remand.

¶ 99                          VI. Filing of Fourth Amended Complaint

¶ 100    Defendants cross-appeal the circuit court's granting of plaintiffs' motion for leave to file their fourth amended complaint, and the jury's verdict on count I of the fourth amended complaint. "The allowance of amendments following the presentation of evidence rests within the sound discretion of the trial court, and the ruling of the trial court will not be disturbed absent an abuse of discretion." *Family Tailored Homes, Inc. v. Manfield*, 233 Ill. App. 3d 477, 479-80 (1992). A court "abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and judgment and ignores recognized principles of law." *InsureOne*, 2012 IL App (1st) 092385, ¶ 121. We affirm.

¶ 101    The Code of Civil Procedure states:

"At any time before final judgment amendments may be allowed on just and reasonable terms *** changing the cause of action or defense or adding new causes of action or defenses, and in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim." 735 ILCS 5/2-616(a) (West 2010).

Moreover, the Code further states, "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." 735 ILCS 5/2-616(c) (West 2010). Courts look at four factors in determining whether to permit amended pleadings under section 2-616(a). First, whether the proposed amendment would cure a defective pleading. *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 69. Second, whether the proposed amendment would surprise or prejudice the opposing party. *Id*. Third, whether the proposed amendment was timely filed. *Id*. And fourth, whether the moving party had previous opportunities to amend. *Id*. The most important of these factors is the prejudice to the opposing party, such as where an amendment leaves the party unprepared to respond to a new theory at trial. *Paschen Contractors, Inc. v. City of Kankakee, Illinois*, 353 Ill. App. 3d 628, 638 (2004).

¶ 102    Defendants argue the filing of the fourth amended complaint prejudiced their case by alleging a different contractual arrangement regarding machines shipped to YG-1 India. They assert that the new theory altered the nature of the proof at trial. Specifically, defendants note

that count VI of the third amended complaint alleged that defendants did not pay for machines shipped to India, and that the fourth amended complaint instead alleged that defendants paid for the machinery but did not pay for reconditioning costs. Defendants claim they were not ready to offer any evidence regarding whether their machines in India were reconditioned, and that the evidence at trial did not support plaintiffs' theory that defendants failed to pay reconditioning costs of machines shipped to India.

¶ 103     As to the filing of the fourth amended complaint, the trial court held that the amendment clarified the claims based on the evidence regarding the parties' alleged reconditioning agreement. This ruling, pursuant to section 2-616(c), was not an abuse of discretion. Plaintiffs alleged, in count VI of their third amended complaint, that YG-1 India failed to pay certain invoices, which were attached to the complaint. In count I of plaintiff's fourth amended complaint, they allege that those invoices were for reconditioning expenses and not the cost of the machines themselves.

¶ 104     As the trial court noted, this amendment conformed the pleadings to the evidence presented at trial. As to surprise or prejudice, defendants fail to show that the amendment prejudiced or surprised them. While defendants easily conclude that they were surprised and prejudiced, they cite no discovery or other paper where plaintiffs stated that the invoices were for the machines themselves. The party opposing an amendment to pleadings has the burden of showing surprise or prejudice resulting from the amendment. See *United Parcel Service v. Church's Fried Chicken, Inc.*, 174 Ill. App. 3d 378, 381 (1988) ("Complainant must be able to show that the amendment hindered his ability to present his case on the merits."). Defendants failed to carry that burden, and absent prejudice, courts should liberally permit amendments to pleadings. See *Paschen*, 353 Ill. App. 3d at 638 ("substantial latitude to amend will be granted when there is no prejudice or surprise to the nonmovant"). Accordingly, the trial court did not abuse its discretion in granting the plaintiffs' motion for leave to file their fourth amended complaint.

¶ 105     As to the jury's verdict on count I of the fourth amended complaint, we find it is not against the manifest weight of the evidence. The jury heard evidence that YG-1 India purchased machines from Grinders and that, as of 2006, YG-1 India owed Grinders over $1 million in unpaid invoices. Sheth testified that these invoices were for reconditioning costs, and that the invoices did not mention reconditioning to avoid additional customs fees. Sheth further testified that YG-1 Korea agreed that it would pay for the machines and that YG-1 India would pay for the reconditioning, which was set at the cost of the machine. Song denied making this oral arrangement. With contrary evidence before it, the jury's verdict on count I was not against the manifest weight of the evidence.

¶ 106                          VII. Plaintiffs' Expert's Testimony

¶ 107     Defendants appeal the circuit court's overruling their objection to the admission of plaintiffs' expert testimony as beyond the scope of her expertise, not in her personal knowledge, and unduly speculative. The admission of evidence is within the sound discretion of a trial court, and we will not reverse that decision absent an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215 (2010). We affirm.

¶ 108    The Illinois Rules of Evidence state that "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 109    Defendants argue that the circuit court erred in admitting several portions of plaintiffs' expert's testimony: (i) her testimony that the parties orally agreed to create two invoices for machines sent to India, ignoring contradictory evidence; (ii) her testimony that Indian regulation required plaintiffs to recondition each machine they shipped to India; and (iii) her testimony regarding the type of reconditioning work plaintiffs performed. Defendants argue that these three areas of testimony were beyond the scope of Egelston's expertise or improper opinion testimony.

¶ 110    Plaintiffs respond that defendants failed to object to Egelston's testimony regarding the parties' oral agreement and failed to file a posttrial motion on the issue, and it is therefore waived. In reply, defendants assert that they preserved their arguments for appeal through their motion in limine, through objections to the foundations of Egelston's testimony, and in their post-trial motion for a new trial.

¶ 111    We hold that defendants failed to preserve their objections to Egelston's testimony for appeal. "The denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is introduced later at trial. 'When a motion *in limine* is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review.' [Citation.]" *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). But "[a]n objection to foundation is not sufficient to alert the trial court to [a party's] claim that the question is not a proper subject for an expert's opinion." *Fenton v. City of Chicago*, 2013 IL App (1st) 111596, ¶ 36. Moreover, this court will not review a trial court's original rulings if the trial judge was not given an opportunity to reassess his or her rulings in a posttrial motion. *In re Parentage of Kimble*, 204 Ill. App. 3d 914, 916-17 (1990). "Illinois case law requires specificity in post-trial motions" (i) "to allow the trial judge to review his own decisions," (ii) "to allow the reviewing court to determine whether the trial court has had an adequate opportunity to assess the allegedly erroneous rulings," and (iii) "to prevent litigants from stating general objections and then raising issues on appeal that the trial judge was never given an opportunity to consider." *Balsley v. Raymond Corp.*, 232 Ill. App. 3d 1028, 1029 (1992).

¶ 112    In their motions *in limine*, defendants objected to Egelston's testimony on two grounds. First, that her accounting expertise was not necessary to review the documents in the case. Second, her testimony improperly relied on credibility determinations that should be left to the jury. The trial judge denied defendants' motion *in limine*. During Egelston's testimony, however, defendants raised objections based only on foundation. Therefore, the evidentiary issues defendants raised *in limine* were waived for purposes of appeal. Moreover, defendants did not raise any objections to the foundation of Egelston's testimony in their posttrial motion. Therefore, the foundation objections were also waived. Thus, we affirm.

¶ 113         CONCLUSION

¶ 114  Accordingly, we affirm in part and reverse on the issue of prejudgment interest.

¶ 115  Affirmed in part and reversed in part; cause remanded.