2025 IL App (1st) 242424-U

FOURTH DIVISION
Order filed: September 26, 2025

Nos. 1-24-2424,1-24-2582, 1-25-0309, 1-25-0385 and 1-25-0711 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| KENNETH WALKER,<br><br>　　　Petitioner-Appellee/Cross-Appellant,<br><br>v.<br><br>MELODY TILLMAN,<br><br>　　　Respondent-Appellant/Cross-Appellee. | ) Appeal from the<br>) Circuit Court of<br>) Cook County.<br>)<br>)<br>)<br>) No. 23 D 79367<br>)<br>)<br>) Honorable<br>) Matthew Link and Naomi<br>) Schuster, Judges presiding. |

JUSTICE QUISH delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's rulings following a bench trial to allow mother to relocate to Tennessee with the parties' child and its order allocating parental decision-making and parenting time were not against the manifest weight of the evidence. The circuit court had jurisdiction to enter a child custody determination under the Uniform Child-Custody Jurisdiction and Enforcement Act. Mother waived any challenge to the insufficiency of service or personal jurisdiction. The circuit court did not abuse its discretion by (1) determining the amount of child support owed by father and deviating downward from the child support guidelines; (2) awarding retroactive child support and allowing father to pay the award on a gradual basis; (3) ordering

that the parties share expenses for extracurricular activities and childcare; (4) not requiring father take out a life insurance policy with the child as the sole beneficiary and mother as the trustee; (5) allowing father to claim the child as dependent on tax returns in alternating years; (6) denying mother's petition for contribution for attorney's fees; (7) awarding and allocating fees for the guardian *ad litem*; and (8) approving an appeal bond upon mother's request. The circuit court's order finding mother in indirect civil contempt was not against the manifest weight of the evidence. Mother forfeited arguments on appeal regarding circuit court's failure to hold hearing on father's petition to maintain status quo, whether the circuit court should have deemed mother's motion for a hearing on relocation an emergency, the circuit court's calculation of father's income for purposes of child support, her motion for sanctions, and her motion to remove the guardian *ad litem*. Appellate court lacked jurisdiction over claims relating to mother's petition for post-judgment and appellate attorney's fees, and her petitions for rule to show cause.

¶ 2   Petitioner, Kenneth Walker ("Kenneth"), and respondent, Melody Tillman ("Melody"), share a minor child, Z.W. In these five consolidated appeals, each party appeals from various orders entered by the circuit court after a four-day bench trial. Only the relevant facts and procedural history of this case necessary for resolution of these appeals are set forth below. For the following reasons, we dismiss one of Melody's appeals in part for lack of jurisdiction and otherwise affirm the orders of the circuit court.[1]

¶ 3   The litigation between the parties centers around their son, Z.W. The parties were in a relationship from approximately March 2022 through the summer/fall of 2022. At the start of their relationship, Melody lived in Murfreesboro, Tennessee, and Kenneth lived in Oak Lawn, Illinois.

---

[1] The first notice of appeal, No. 1-24-2424, was filed on December 9, 2024. On January 16, 2025, No. 1-24-2582 was consolidated into No. 1-24-2424 and marked for accelerated disposition under Supreme Court Rule 311(a). Ill. Sup. Ct. R. 311(a) (eff. Jul. 1, 2018). Accordingly, the decision was due on May 8, 2025. Ill. Sup. Ct. R. 311(a)(5). However, after a request from the parties, this court stayed the case from January 16 to April 25, 2025, while both parties litigated motions to reconsider in the circuit court regarding several of the same issues raised in these appeals. Once the circuit court resolved the parties' motions to reconsider, the parties filed three additional appeals, which were consolidated with the first two appeals. The parties then sought and received several extensions to complete briefing. Given these events, we find that good cause exists to issue this decision past the 150-day deadline set forth in Rule 311(a)(5).

Melody moved from Tennessee to an apartment in Justice, Illinois in November 2022. Z.W. was born on February 24, 2023, in Illinois and lived with Melody in Justice after both were discharged from the hospital. Kenneth was present at Z.W.'s birth and visited Z.W. every day at Melody's apartment for the first month.

¶ 4    On March 23, 2023, Kenneth initiated this action by filing a Petition for Allocation of Parental Responsibilities under the Illinois Marriage and Dissolution of Marriage Act ("Act"), 750 ILCS 5/600 *et seq.* (West 2022), asking that Kenneth and Melody be awarded permanent joint significant decision-making authority regarding Z.W. and Kenneth be awarded parenting time in accordance with Z.W.'s best interests.

¶ 5    On April 27, 2023, Melody filed a Petition for Relocation under 750 ILCS 5/609.2 (West 2022). She asserted that it was in Z.W.'s best interests for Melody to relocate with him to Tennessee, as it would provide them with a stronger support system and Melody would be able to complete her nursing degree at Middle Tennessee State University. Melody also sought an allocation of parental responsibilities and parenting time.

¶ 6    Melody next filed a Petition for Temporary and Permanent Child Support, seeking an order for child support retroactive to Z.W.'s birth and requiring Kenneth to contribute to Z.W.'s monthly health insurance premiums, out-of-pocket medical expenses and childcare expenses. On July 10, 2023, and upon Kenneth's motion, the court appointed attorney Stuart Gelfman ("Gelfman") as guardian *ad litem* ("GAL"). Gelfman completed his initial report on April 1, 2024, and provided an addendum before trial based on additional information provided by Melody.

¶ 7    The court held a four-day bench trial on October 8, 9, 15, and 16, 2024, on Kenneth's Petition for Allocation of Parental Responsibilities and Parenting Time, Melody's Petition for

Relocation, Melody's Petition for Temporary and Permanent Child Support, Melody's Petition for Reallocation of GAL Fees, Melody's First Amended Petition for Declaratory Relief and the GAL's Petition for Rule to Show Cause against Melody. Kenneth testified on his own behalf and called Melody and Gelfman as witnesses. Melody called her father, James Tillman ("James"), her mother, Debra Cooper ("Debra"), her stepfather, Cornelious Cooper ("Cornelious"), her aunt, Teresa Terry Tillman ("Teresa"), Gelfman, and Kenneth and testified on her own behalf. The evidence at trial relevant to the issues raised in this appeal will be discussed below.

¶ 8    In its ruling issued on November 26, 2024, the circuit court denied Melody's First Amended Petition for Declaratory Relief, granted Melody's Petition for Relocation and allocated primary decision-making authority to Melody. The circuit court also entered an Allocation Judgment granting Kenneth parenting time in Illinois on the second weekend of each month, and in Tennessee on the fourth weekend of each month, with the option for additional parenting time in Tennessee. The circuit court ordered Kenneth to pay $937 per month in child support and ordered Kenneth to pay 55% of Gelfman's fees and Melody to pay 45%. Lastly, the court held Melody in indirect civil contempt of court for failing to pay a portion of Gelfman's fees as required by the court's June 7, 2024, order.

¶ 9    Both parties filed motions to reconsider. On February 18, 2025, the circuit court granted Kenneth's motion in part, granting his request for a downward deviation of his child support obligation based on additional travel expenses and reduced his obligation to $713 per month, and granting his request to claim Z.W. as a dependent on his taxes in alternating years, contingent upon him being current on his child support obligations. The circuit court also granted Melody's motion in part, ordering Kenneth to pay $7,260.14 in retroactive child support on a gradual basis. The

circuit court denied both motions to reconsider in all other respects. Melody filed a second motion to reconsider, which the court denied on April 10, 2025. Additional procedural history relevant to the issues raised in this appeal will be discussed below.

¶ 10   Melody filed her first notice of appeal (1-24-2424) on December 9, 2024 (amended on December 10, 2024) from the circuit court's November 26, 2024, and December 10, 2024, orders. On February 19, 2025, Melody filed a second notice of appeal (1-25-0309) from the circuit court's orders resolving the parties' motions to reconsider. Melody filed a third notice of appeal on April 18, 2025 (1-25-0711) adding the April 10, 2025, order.  Kenneth filed his first notice of appeal (1-24-2582) on December 26, 2024 (amended on January 22, 2025), appealing from the orders and judgments entered on November 26, 2024. Kenneth filed an additional notice of appeal (1-25-0385) on March 4, 2025, appealing the circuit court's orders on the parties' motions to reconsider. This court consolidated all five appeals and marked them accelerated under Supreme Court Rule 311(a).

¶ 11   I.   Kenneth's Appeals

¶ 12   In his appeals, Kenneth argues that the circuit court's orders allowing Melody to relocate Z.W. to Tennessee and allocating parental decision-making and parenting time were against the manifest weight of the evidence and contrary to Z.W.'s best interests. This court has jurisdiction over these appeals under Supreme Court Rule 304(b)(6) (eff. Mar. 8, 2016).  See *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 30.

¶ 13   A.   Relocation

¶ 14   A parent's request to relocate a child outside of Illinois is governed by Section 609.2 of the Act, which requires the court to consider the following factors in making such a

determination: (1) the circumstances and reasons for the intended relocation; (2) the reasons, if any, why a parent is objecting to the intended relocation; (3) the history and quality of each parent's relationship with the child and specifically, whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment; (4) the educational opportunities for the child at the existing location and the proposed new location; (5) the presence or absence of extended family at each location; (6) the anticipated impact of relocation on the child; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if relocation occurs; (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child; (10) minimization to the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the child's best interests. 750 ILCS 5/609.2(g)(1)-(11) (West 2024).

¶ 15    In ruling on a relocation petition, a trial court's paramount consideration is the best interests of the children. *Fatkin*, 2019 IL 123602 at ¶ 32. A best interests determination "'cannot be reduced to a simple bright-line test'" and a ruling on the best interests of a child "'must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case.'" *Id.* (quoting *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988)). A "'trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.'" *Id.* (quoting *Eckert*, 119 Ill. 2d at 328). "Such deference is appropriate because the trier of fact had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their

temperaments, personalities, and capabilities." (internal quotation marks omitted.) *Id.* "Accordingly, '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.'" *Id.* (quoting *Eckert*, 119 Ill. 2d at 326).

¶ 16 At trial, Melody testified that she grew up in Illinois but moved to Tennessee in 2020. She had two children: Z.W., and a four-year-old daughter from a prior relationship. She came to Illinois in November 2022 to assist her father, James, with his dialysis, but never intended to stay in Illinois permanently. Melody ended her relationship with Kenneth in December 2022 and intended to return to Tennessee. She acknowledged that the initial lease for her apartment in Justice was for one year, and that she transferred her employment with Ascension Hospital from a location in Tennessee to an Illinois location when she arrived in Illinois.

¶ 17 Melody also testified that she had family in both Illinois and Tennessee. Debra, Cornelious, one of Melody's brothers, and multiple cousins lived in Tennessee. Debra and Cornelious both testified that they gave significant financial support to Melody, Melody would be able to live with them, and they would assist with childcare should Melody relocate to Tennessee. James, Teresa, and three of Melody's brothers lived in Illinois. At the time of trial, Melody was living with one of her brothers.

¶ 18 James testified that he was on dialysis and in a wheelchair, limiting his ability to assist Melody or provide care for Z.W. Teresa helped with Z.W., including picking him up from day care and dropping him off with Kenneth. However, Teresa testified that it would be impractical for her to continue providing the same level of support because she was a full-time caregiver for James. Melody's brothers who lived in Illinois did not provide significant care for Z.W.

¶ 19 Melody testified that she suffered from sickle cell disease, which resulted in "pain crises,"

which were worse in cold or severe weather. She acknowledged that she suffered from pain crises both in Illinois and Tennessee but stated that the warmer weather in Tennessee was one reason she wanted to relocate. She was accepted into a clinical treatment program at Vanderbilt in early 2024. She originally learned about the program through a family member and started meeting with a nurse practitioner about possibly entering the program in 2020 or 2021. Melody attended Middle Tennessee State University starting in the fall of 2021 and had made progress towards a bachelor's degree in nursing before withdrawing from school in August 2022 due to her pregnancy. At the time of trial, Melody was four semesters away from graduating.

¶ 20  Kenneth testified that his relationship with Melody ended in approximately July 2022, shortly after he learned she was pregnant, but they remained in contact. During their relationship, they would travel between Illinois and Tennessee to visit each other at least once a month. He visited Melody in Tennessee twice after their relationship ended. Kenneth testified that he spoke with Melody during her pregnancy and they agreed she would move to Illinois and they would co-parent the child. He testified that Melody never told him that she relocated to Illinois to care for James. He was present for Z.W.'s birth, and the parties were able to co-parent amicably for the first month. In March 2023, Melody approached him about getting back together, but he declined. After this conversation, their co-parenting relationship became strained, and Melody told him that she intended to return to Tennessee with Z.W.

¶ 21  Kenneth testified that he would be able to provide significant support for Z.W. in Illinois, and that his mother, a certified caregiver, could help with childcare. He acknowledged that his mother and Melody had a contentious relationship, in part because his mother filed a DCFS report against Melody in April 2023, which was ultimately determined to be unfounded. Kenneth

objected to Melody's mother providing care for Z.W., as he was aware of multiple incidents between Melody and her mother while Melody was growing up. He testified that if relocation were granted, it would be a significant financial burden for him to travel to Tennessee to spend time with Z.W.

¶ 22    In his written report and trial testimony, GAL Gelfman recommended against relocation. He found that Melody's reasons for relocation were mostly focused on her personal needs rather than what was in the best interest of Z.W. Melody never told him that she only moved to Illinois on a temporary basis to care for James. He noted that there were several options for nursing programs and treatment programs for sickle cell disease in the Chicago area, but Melody did not meaningfully investigate those programs. Gelfman found that it was in Z.W.'s best interest for Kenneth to have regular parenting time and for both parents to live in the same state.

¶ 23    In granting Melody's petition to relocate, the circuit court detailed its factual findings and application of those findings to each of the relevant Section 609.2 factors. The court noted that it heard the testimony of the parties and witnesses, considered all the evidence, and determined the witnesses' credibility. With respect to the first factor, the court determined that Melody wanted to return to Tennessee with Z.W. and her older child to complete her education and receive her nursing degree from Middle Tennessee State University, to participate in a stem cell transplant program at Vanderbilt University Medical Center for her sickle cell disease and because the severe Chicago winter triggered her pain crises related to sickle cell. Melody testified that living in Illinois was a financial burden and she had a better support system in Tennessee where she intended to live with her mother and stepfather who would provide childcare at no cost.

¶ 24    The court further noted that Z.W.'s maternal grandmother and her husband both testified

that Melody and her children were welcome at their home and they would provide support. The court addressed Kenneth's argument that Melody's reasons for moving to Illinois in November 2022 changed throughout the litigation and discussed the contradictory testimony, but found that Melody's initial reasons for moving to Illinois were less important than her intended reasons for relocation to Tennessee, noting that her intended reasons for relocation have not been seriously questioned. The court noted that Melody was a nursing student at Middle Tennessee State University when she unenrolled after learning she was pregnant in 2022, she had completed half of her course work required for a degree, she was no longer eligible for financial aid, tuition was more affordable at Middle Tennessee than at nursing schools in Illinois, and that Melody and her children would be eligible for campus housing, if they wished. The court found that Melody testified she intended to receive a stem cell transplant at Vanderbilt University which required her to be hospitalized for at least five days and to remain within 30 miles of the hospital for no less than 100 days after the procedure. Melody had been investigating that program since a family member successfully underwent the procedure in 2021.

¶ 25    The court noted that, although Gelfman testified it was concerning that Melody failed to raise the stem cell transplant issue with him before he completed his initial report, the court credited Melody's testimony that she notified Gelfman about the program only after she was approved. The court also addressed Gelfman's concern that Melody failed to consider medical treatment and educational opportunities in Illinois and held that, although Melody admitted that she did not thoroughly research nursing school options in Illinois, she did research cost and the cost of tuition at Illinois schools was more than she could afford. The court noted that Melody testified about the prerequisite courses she completed for Middle Tennessee and that it was

important to graduate with a high grade point average and honor she obtained at that school. While Melody admitted that she did not thoroughly research stem cell transplant programs in Illinois, she was referred to the Vanderbilt program by her oncologist and was familiar with the success her family member experienced at Vanderbilt. The court found that Melody testified credibly that her preference was based on her belief that Vanderbilt had a top-rated stem cell program. The court then held that the evidence produced was insufficient to demonstrate that Melody's reasons for the intended relocation were pretextual and this favor weighed in favor of relocation.

¶ 26    With respect to the second factor, the circuit court noted that Kenneth objected to Z.W.'s relocation because it would negatively affect his ability to exercise regular and consistent parenting time with the child. The court found that Kenneth testified credibly that he and Z.W. bonded and Gelfman also observed the bond between them. The court acknowledged the importance of the father being involved in the child's life and discussed the National Institute of Health study relied upon by Gelfman regarding parental bonding. The court also noted Kenneth's objection that relocation would be detrimental to Z.W.'s relationship with Kenneth's family members and found this factor weighed against relocation.

¶ 27    As to the third factor, the court noted that Melody had been Z.W.'s primary caretaker since birth and Kenneth had parenting time. The court found both parties to be loving and attentive parents. Both Kenneth and Melody reported that the other was a good parent. Gelfman also reported that both Kenneth and Melody were caring and loving parents who were extremely attentive to Z.W. The child bonded with both parents. The court found that this factor weighed against relocation. The fourth and eighth factors were not applicable in this case due to Z.W.'s young age. With respect to the fifth factor, the court noted that some of the parents' family

members resided in Illinois and some in Tennessee. Although Gelfman found that Melody's aunt Teresa was Melody's support system and Melody had an equal opportunity for family support in Illinois and Tennessee based largely on the fact that Teresa lived in Illinois, the court held that Teresa credibly testified that she now worked full-time as a paid caregiver for Melody's father and had not been able to assist Melody with Z.W. as she once had. The court found that Melody's testimony that she would have a stronger support system and constant help with Z.W. in Tennessee was unrebutted and that support from Kenneth's family in Illinois was not practical due to distrust after Kenneth's mother reported Melody to DCFS. The court held that, on balance, this factor favored relocation.

¶ 28   Under the sixth factor, the circuit court held that relocation to Tennessee would increase Z.W.'s economic security because Melody and Z.W. would reside with Melody's mother and stepfather while Melody completed her nursing degree. The court also held that Z.W. would benefit from having a mother who was potentially cured of sickle cell disease and its debilitating effects following the stem cell transplant and Z.W. would spend time with family members, rather than being enrolled in day care full-time. The court acknowledged that Z.W.'s ability to build on his bond with his father may be adversely affected by relocation, but held that this impairment may be minimized by fashioning a reasonable and realistic parenting schedule and thus, that factor weighed in favor of relocation. With respect to the seventh factor, the court noted that Melody's relocation to Tennessee prevented the court from fashioning a parenting schedule that provided Kenneth with weekly parenting time consistent with his request, but the pivotal question was whether a reasonable and realistic visitation schedule could be created. The court credited Melody's testimony that she was willing to bring Z.W. to Illinois once or twice a month and that

Kenneth was free to exercise parenting time in Tennessee at any reasonable time. The court held that, notwithstanding the fact that Kenneth's regular weekly parenting time will change, this factor weighed in favor of relocation.

¶ 29 Under factor nine, the court held that neither party was affluent, but both evidenced an ability to travel between Tennessee and Illinois regularly when the parties were dating in 2022. Melody had several close family members and her treating oncologist in Illinois. The court credited her argument that her trips to Illinois could serve as an opportunity for her children to visit their family members and therefore, her monthly return to Illinois with Z.W. was practical and economically feasible, weighing in favor of relocation.

¶ 30 Under factor 10, the court acknowledged that Melody's relocation to Tennessee would prevent Kenneth from exercising weekly parenting time with Z.W. The court noted that it was "well aware" of Kenneth's position that this would detrimentally affect his relationship with Z.W., but held that any impairment to the father-child relationship would be minimized by implementing the parenting time schedule set forth in the Allocation Judgment and thus, this factor weighed in favor of relocation. With respect to the final factor, the court noted Gelfman's testimony that Melody placed her own needs before Z.W.'s and opined that Melody's position minimized the importance of Kenneth interacting with Z.W. on a regular and consistent basis. The court found that there was "little doubt" that Melody would benefit from receiving a stem cell transplant at Vanderbilt, receiving her nursing degree at Middle Tennessee and receiving support from her family members in Tennessee. However, the circuit court held that it must also consider the likely benefits that Z.W. would receive from Melody's overall improved quality of life, finding that the lives of Melody and Z.W. were intertwined. The court considered the potential benefits that Z.W.

may experience from Melody's life enhancement as relevant and "especially important in this case." It noted that the benefits to Z.W. of a having a mother cured of sickle cell disease were "obvious" and that numerous witnesses testified about Melody's pain crises and the many hospitalizations resulting therefrom. The court also noted that Melody was seeking to relocate to where she would have a stronger support system and constant help with Z.W. and she would have the opportunity to lean on her support system while completing her nursing degree to better the economic situation of her and Z.W., which weighed in favor of relocation.

¶ 31 Finally, the court noted that relocation cases were difficult and that this case was "especially so because neither parent demonstrated bad faith" and both parents were loving and attentive and bonded with Z.W. The court found that no matter what the outcome, one party's life would likely be detrimentally affected. The court considered Gelfman's recommendation against relocation and the importance of Kenneth being actively involved in Z.W.'s life, but held that the benefits to Melody and Z.W. in relocating to Tennessee were "compelling" and any impairment to the father-child relationship would be minimized by a parenting schedule that provided Kenneth with monthly extended weekend parenting time in Illinois and parenting time in Tennessee at any reasonable time as proposed by Melody. After considering all of the relevant factors in Section 609.2(g), the circuit court found that it was in Z.W.'s best interest that Melody be permitted to relocate to Tennessee with Z.W. and granted Melody's Petition for Relocation.

¶ 32 In his appeal, Kenneth challenges the circuit court's relocation ruling following the trial. However, many of his arguments are based on facts, arguments and statements made in motions and other documents filed by Melody in the circuit court months after the bench trial concluded. He argues that these documents show that "Melody has failed to deliver on any of her intentions"

expressed at trial concerning her move to Tennessee and thus, the circuit court's ruling granting Melody's relocation petition should be reversed. Kenneth cites no authority to support his argument that we can consider such information which was not adduced at the trial. See *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 21 (declining to consider any evidence that was not presented to the trial court before entry of the judgment). Further, there is no indication in the appellate record that Kenneth ever raised this argument in the circuit court. Accordingly, this argument is forfeited. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 59 ("This court may deem any arguments not raised in the trial court as waived or forfeit[ed] on appeal.").

¶ 33 Next, Kenneth argues that the circuit court's ruling granting relocation is against the manifest weight of the evidence because Melody's reasons for relocating shifted during the case and they were primarily for her own benefit, rather than Z.W.'s, citing Gelfman's testimony. The circuit court addressed this argument and Gelfman's testimony in its ruling and found Melody's reasons for relocation were genuine and would benefit Z.W. as well as Melody. This finding is supported by the evidence adduced at trial, as explained above. Kenneth has not shown how the circuit court's finding was against the manifest weight of the evidence. See *Fatkin*, 2019 IL 123602 at ¶ 32.

¶ 34 Kenneth next argues that the court "completely disregarded the GAL's determination" that Z.W. would be negatively impacted by Kenneth's decrease in parenting time and did not defer to the GAL's recommendation against relocation. However, the court's oral ruling shows it did consider Gelfman's testimony and his recommendation, but found that the benefits to Melody and Z.W. in relocating to Tennessee were "compelling," including Melody finishing her nursing degree, receiving medical treatment for her sickle cell disease and receiving support from her

family members in Tennessee. The circuit court also determined that the impairment to Kenneth's relationship with Z.W. would be minimized by the parenting schedule, which weighed in favor of relocation. Kenneth cites no authority for his argument that the circuit court was required to afford Gelfman's testimony more weight and thus, we reject it.

¶ 35 Kenneth also argues that the circuit court credited some testimony at trial over others in terms of Melody's family support in Illinois and Tennessee. However, in a bench trial, it was for the circuit court to determine the weight to be given to each witness' testimony. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27 (the "trial court is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive."). Further, the court noted that Melody's testimony that she would have a stronger support system and constant help with Z.W. in Tennessee was unrebutted. Kenneth does not cite any evidence from the trial to contradict this finding. Although Kenneth cites other appellate court cases on relocation which he argues are factually similar to support his argument that the circuit court's ruling should be reversed, "other relocation cases are of limited value for purposes of comparison because the result in each case depends on the unique facts and circumstances of the case." *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 71. Accordingly, we find that the circuit court's findings are supported by the record, and we will not reweigh the evidence or substitute our judgment for that of the circuit court. See *Fatkin*, 2019 IL 123602 at ¶ 34 n.2.

¶ 36 Next, Kenneth challenges the court's finding as to factor 7, arguing that a visitation schedule where Kenneth sees Z.W. one weekend every two weeks is insufficient to sustain his relationship with Z.W. and it is impractical to have Z.W. fly to Illinois once a month. The circuit court acknowledged Melody's relocation would adversely affect Kenneth's parenting, but held

that this impact would be minimized with a parenting schedule, crediting Melody's testimony that she was willing to bring Z.W. to Illinois once or twice a month and that Kenneth was free to exercise parenting time in Tennessee at any reasonable time. We cannot say that the evidence at trial was such that the opposite conclusion on this factor is apparent, especially given that, as discussed below, the circuit court's Allocation Judgment only minimally reduced Kenneth's parenting time. See *Fatkin*, 2019 IL 123602 at ¶ 32.

¶ 37 Kenneth next challenges the court's ruling as to factor 9 which involves the possible arrangements for the exercise of parenting responsibilities appropriate for the parents' resources and the child's developmental level. The circuit court found that the parties demonstrated an ability to travel between Illinois and Tennessee during their relationship, and that Melody indicated that she would return to Chicago for medical appointments and to see family, weighing in favor of relocation. Kenneth argues that Melody lacks the resources to bring Z.W. to Illinois once a month and he lacks the resources to visit Z.W. in Tennessee. However, Kenneth's argument relies on facts or evidence adduced only **after** the trial, which we cannot consider for the first time on appeal from the circuit court's ruling after a bench trial. See *Micheli*, 2014 IL App (2d) 121245 at ¶ 21; *Sheth*, 2013 IL App (1st) 110156, at ¶ 59. Based on all of the evidence presented at trial, we hold that the circuit court's finding as to this factor is not against the manifest weight of the evidence.

¶ 38 For factor 10, the minimization of the impairment to a parent-child relationship caused by a parent's relocation, the circuit court found that any impairment caused by Z.W. relocating can be minimized by implementing the parenting schedule in the Allocation Judgment, which weighed in favor of relocation. Kenneth's sole argument as to this factor relates to post-trial developments, namely, Melody's actions **after** she moved to Tennessee and Kenneth's financial inabilities. In

reviewing the circuit court's decision following a bench trial, we cannot consider facts which were not before the circuit court at that trial. *Micheli*, 2014 IL App (2d) 121245 at ¶ 21. Accordingly, we reject Kenneth's argument and find that the circuit court's findings were not against the manifest weight of the evidence.

¶ 39   In a relocation case, "'[t]he presumption in favor of the result reached by the trial court is always strong and compelling.'" *Eckert*, 119 Ill. 2d at 326 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)). In this case, the circuit court considered the statutory factors and weighed them based on the evidence at trial, making specific factual findings and credibility determinations as it did so. We cannot say that the circuit court's factual findings on any factor or its conclusion that relocation was in Z.W.'s best interest is clearly against the manifest weight of the evidence or that a "manifest injustice has occurred." See *Fatkin*, 2019 IL 123602 at ¶ 32. Rather, the circuit court's findings were based on evidence adduced at trial. Therefore, we affirm the circuit court's order granting Melody's petition to relocate to Tennessee with Z.W.

¶ 40      B.       Allocation of Decision-Making Responsibility

¶ 41   We next address Kenneth's challenge to the circuit court's allocation of decision-making responsibility for Z.W. The court allocates decision-making responsibilities according to the child's best interests.  750 ILCS 5/602.5(a) (West 2024). In determining the child's best interests, "the court shall consider all relevant factors, including, without limitation:" the child's wishes; the child's adjustment to his or her home, school and community; the mental and physical health of all individuals involved; the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making; the level of each parent's participation in past significant decision-making with respect to the child;  the parents'

wishes; the child's needs; the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules and the ability of the parents to cooperate in the arrangement; whether a restriction on decision-making is appropriate under Section 603.10; the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; the physical violence or threat of physical violence by the child's parent directed against the child; whether one of the parents is a sex offender; and "any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2024). The circuit court is not required to make explicit findings on each factor or refer to every factor. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. This court will not reverse the circuit court's allocation of parental decision-making responsibility unless it is against the manifest weight of the evidence. *Id.*

¶ 42    The evidence at trial established that the parties occasionally had disagreements regarding decision-making for Z.W., particularly whether he should be enrolled in day care, the choice of baby formula, and whether he should receive a flu vaccination. The most contentious issue was day care, as Kenneth testified that Z.W. frequently got sick from day care, and Melody would enroll Z.W. in day care without consulting him. Kenneth preferred to have Z.W. stay with his mother, who offered to watch Melody's daughter as well. Melody objected to that arrangement, in part because Kenneth's mother previously filed a complaint with DCFS against her. Gelfman recommended that both parties receive joint decision-making authority and expressed optimism that the parties would be able to set aside any animosity between them for Z.W.'s sake.

¶ 43    The circuit court referred to the 15 factors in Section 602.5(c) and expressly considered and discussed them in its ruling.  The court noted that some of the factors were not applicable

based on Z.W.'s age. It found that the parties' apparent inability to agree and communicate and the distance between Kenneth and Melody's residences given that it allowed relocation weighed against joint decision-making. It observed that Melody was primarily responsible for making significant decisions for the early part of Z.W.'s life and demonstrated the ability to work with Kenneth regarding parenting time and keeping Kenneth informed of medical appointments. It noted that, notwithstanding the conflict between the parties due to this litigation, Melody evidenced a willingness and ability to encourage a close and continuing relationship between Kenneth and Z.W. The court found that Kenneth's involvement with Z.W.'s medical care weighed in favor of his input on medical decisions. After considering all of the factors, the court granted Melody primary decision-making, with a requirement that she consult with Kenneth prior to making certain medical decisions.

¶ 44 Kenneth argues that the circuit court erred in granting Melody primary decision-making rather than ordering joint decision-making, as the parties have been able to overcome their disagreements to make decisions for Z.W. together. The circuit court's findings were supported by evidence that the parties had difficulty communicating, had disagreements regarding decisions such as whether to enroll Z.W. in day care, and that joint decision-making would prove more difficult given that the parties would live further apart after relocation was granted. Thus, the court's allocation of parental decision-making was not against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048 at ¶ 47.

¶ 45    C.    Parenting Time

¶ 46 Kenneth next challenges the circuit court's allocation of parenting time. "The court shall allocate parenting time according to the child's best interests." 750 ILCS 5/602.7(a). The court

"shall consider all relevant factors" in making this determination, including 17 specific factors similar to the factors for allocation of decision-making responsibilities. 750 ILCS 5/602.7(b) (West 2024). The circuit court's allocation of parenting time will not be disturbed unless it is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048 at ¶ 53.

¶ 47   The evidence at trial showed that Melody had primary custody and spent the majority of time with Z.W. When the parties were on relatively amicable terms prior to this litigation, Kenneth testified that he would go to Melody's house nearly every day to spend time with Z.W., but their co-parenting relationship soured when this litigation began in March 2023. The circuit court's temporary orders on parenting time initially granted Kenneth parenting time every Saturday and Sunday from 2 p.m. to 6 p.m. Based on Gelfman's recommendations, Kenneth's parenting time was expanded to include overnight weekend parenting time every other weekend from Friday night until Sunday morning, and weekday parenting time on Monday and Wednesday evenings between 5:30 p.m. and 8:00 p.m.

¶ 48   If relocation was granted, Gelfman proposed a parenting schedule where Melody would bring Z.W. to Illinois once a month for a long weekend, and Kenneth would come to Tennessee to visit Z.W. once a month for a second long weekend. Gelfman also proposed that Kenneth would have Z.W. for every spring break in Illinois, the parties would alternate holidays, and Kenneth would have additional parenting time in Tennessee with seven days' notice to Melody. Gelfman recommended that the cost of bringing Z.W. to and from Illinois should be attributed to Melody.

¶ 49   The circuit court considered and discussed the factors set forth in Section 602.7(b) in its ruling. The court found the distance between the parents' residences was particularly important and considered that in crafting a parenting schedule. That parenting schedule mirrored Gelfman's

recommendations, giving Kenneth parenting time in Illinois on the second weekend of each month from Friday at 5:00 p.m. until Monday at 9:00 a.m., and in Tennessee on the fourth weekend of each month from Friday at 5:00 p.m. until Monday at 9:00 a.m. It also ordered that, at other times as agreed upon by the parties, Melody would not unreasonably refuse Kenneth's request to exercise additional parenting time with Z.W. in Tennessee, with seven days' notice. The court split the parties' parenting time for holidays and over the summer roughly equally, with the exception that Kenneth would have parenting time during spring break every year.

¶ 50    Kenneth argues that he consistently showed his willingness to put Z.W.'s interests first and an active interest in spending as much time with Z.W. as possible. He asserts that, should this court affirm relocation, he should be granted more parenting time in the summer. The circuit court's Allocation Judgment granted Kenneth similar parenting time to what he had prior to trial, expanding the time that Kenneth had during alternating weekends, but eliminating his weekday parenting time. Based on the trial testimony, Gelfman's recommendations and the circuit court's consideration of the relevant factors, we find that the circuit court's allocation of parenting time is not against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048 at ¶ 53.

¶ 51    II.    Melody's Appeals

¶ 52 We turn to the issues raised in Melody's appeals. First, we agree with Kenneth that Melody's briefs fail to comply with Supreme Court Rule 341 in numerous respects, which hampers our review. She does not state the issues presented for review in the body of her opening brief, instead referring to a page in the appendix titled "Summary of Issues on Appeal." See Ill. Sup. Ct. R. 341(h)(3) (eff. Oct. 1, 2020). The statement of facts in her opening brief contains three pages and provides only a brief procedural history of the proceedings below and no discussion of the

evidence at trial. See Ill. Sup. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Several sections of Melody's briefs lack any citation to authority and she often misstates the applicable standard of review for the issues she raises without any citation. Ill. Sup. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (The argument portion of a brief "shall contain the contentions * * * and the reasons therefor, with citations to authorities * * *."). Additionally, many portions of Melody's briefs purport to "adopt[] and incorporate[] herein the arguments made at the circuit court on this issue" without raising any additional argument. A statement that a party incorporates their arguments made before the circuit court, without more, is not a sufficient presentation of those arguments and results in the forfeiture of those claims. *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010); *People v. Guest*, 166 Ill. 2d 381, 413-14 (1995). Melody's appellant's brief also exceeds the page limit that this court extended to 65 pages.

¶ 53    Kenneth asks us to dismiss Melody's appeals in their entirety due to her egregious failure to comply with Rule 341. Given the multiple infirmities with Melody's brief, it would be within our discretion to do so. See *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 77. We decline to take that measure, but, as explained below, to the extent to which Melody fails to adequately present and develop her arguments before this court, we find them forfeited.

¶ 54    A.    Jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act

¶ 55 Melody first argues that the circuit court erred by denying her petition for declaratory judgment under the Uniform Child-Custody Jurisdiction and Enforcement Act ("UCCJEA") and all of its orders related to custody are void. On the eve of trial, Melody filed a petition for declaratory judgment, which, she asserts, is a "combined motion to dismiss and petition to quash," arguing that Illinois does not have subject matter jurisdiction over the initial child custody

determination for Z.W. under the UCCJEA. She asserted that, since Melody was a permanent resident of Tennessee and was only temporarily in Illinois when Z.W. was born, Z.W.'s home state is Tennessee. The circuit court rejected this argument and denied her petition, finding that Illinois had initial child-custody jurisdiction under the UCCJEA because Z.W. was born in Illinois and it was his home state at the time these proceedings commenced. We agree with the circuit court.

¶ 56 The UCCJEA provides that Illinois has jurisdiction to make an initial child-custody determination if it is "the home State of the child on the date of the commencement of the proceeding." 750 ILCS 36/201(a)(1) (West 2024). It defines "Home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." 750 ILCS 36/102(7) (West 2024). For a child less than six months old, however, "home state" is defined as "the state in which the child lived from birth" with a parent. *Id.* As this issue concerns the interpretation of the UCCJEA, it is a question of law that we review *de novo*. *Id.* at 313.

¶ 57 Z.W. was less than six months old when Kenneth filed his Petition for Allocation of Parental Responsibilities, and therefore, his "home state" under the UCCJEA is the state where he lived from birth with Melody. The undisputed facts establish that Z.W. was born in Illinois and lived exclusively with Melody in Illinois until the commencement of this proceeding less than one month later. Therefore, Illinois has home state jurisdiction for an initial child-custody determination under the UCCJEA.

¶ 58 Melody's argument that Tennessee is Z.W.'s home state because he had not lived in Illinois for six months is based on the definition of "home state" for children older than six months, which did not apply to Z.W. who was less than one month old when Kenneth filed his petition.

¶ 59   Melody also argues that she was "temporarily absent" from her home state of Tennessee when Z.W. was born and thus, Tennessee is Z.W.'s home state. However, the UCCJEA focuses on the home state of the child, not the parent.  Although the UCCJEA's definition of "home state" includes a statement that "a period of temporary absence of any of the mentioned persons is part of the period" for purposes of determining the six-month period for home state jurisdiction (750 ILCS 36/102(7) (West 2024)), that relates to the child's temporary absence from the state, not the parent's. Here, Z.W. lived exclusively in Illinois from the day of his birth until after Kenneth commenced this proceeding.  He was never temporarily absent from Illinois before that time.

¶ 60    In support of her argument, Melody cites to *In re Marriage of McDermott*, 307 P.3d 717 (Ct. App. Wash. 2013). In that case, the child was born in Costa Rica and spent six weeks there, lived in Kansas for five and a half months, then moved to Washington. *Id.* at 726. The child was nine months old at the time the proceedings were filed. The Washington court held that Kansas was the child's home state because the time in Costa Rica constituted a temporary absence from Kansas, and therefore, the child lived in Kansas for more than six consecutive months when including the six weeks in Costa Rica. *Id.*

¶ 61    *McDermott* is not binding on this court (see *People v. Nelson*, 2021 IL App (1st) 181483, ¶ 36) and, in any event, is distinguishable. Unlike the child in *McDermott*, Z.W. was under six months old at the time this action was filed and had never lived in Tennessee, and therefore, he could not have been "temporarily absent" from Tennessee. Melody's argument assumes, without citation to relevant authority, that the state in which she claims permanent residence is the home state of Z.W. even if he has not lived there, an argument which has no basis in the UCCJEA. While Melody apparently intended to return to Tennessee shortly after Z.W.'s birth, we cannot find that

Z.W. was temporarily absent from a state in which he never lived. The undisputed evidence at trial established that Illinois is Z.W.'s home state, as he was born in Illinois, returned to Melody's home in Justice, Illinois after being discharged from the hospital, and lived in Justice until long after this litigation was commenced. Therefore, Illinois has initial child-custody jurisdiction under the UCCJEA and none of its orders are void. The circuit court correctly rejected Melody's argument.

¶ 62    B.        Personal Jurisdiction/Due Process

¶ 63    Next, Melody argues that the circuit court lacked personal jurisdiction over her because the special process server who served her with Kenneth's petition was not first appointed by the circuit court. Even if Melody was not properly served with Kenneth's petition, we find that she waived any objection to the sufficiency of process or to personal jurisdiction. A party objecting to personal jurisdiction or arguing the insufficiency of process must first file a motion to dismiss the action. 735 ILCS 5/2-301(a) (West 2024). If a party files "any other pleading or motion" prior to filing a motion objecting to the court's jurisdiction over the party's person, except for limited exceptions not relevant in this case, the party "waives all objections to the court's jurisdiction over the party's person prospectively." 735 ILCS 5/2-301(a-6) (West 2024). Here, Melody filed an appearance, an answer to Kenneth's petition, a petition for temporary and permanent child support, and a petition for relocation. Melody did not file a motion to dismiss or object to any alleged insufficiency of process or personal jurisdiction in the circuit court at any time. In fact, she raises this argument for the first time on appeal. Accordingly, Melody waived any objections to personal jurisdiction. 735 ILCS 5/2-301(a-6) (West 2024); *Sheth*, 2013 IL App (1st) 110156 at ¶ 59.

¶ 64    Melody also asserts that the circuit court erred by finding that her Emergency Motion to Set Hearing Date and Motion to Modify Temporary Parenting Order filed on January 11, 2024,

was not an emergency. She also argues that the circuit court violated her due process rights by not conducting an expedited evidentiary hearing on "the TRO Petition." However, Melody cites no authority to support either argument and fails to properly develop them. Accordingly, these arguments are forfeited. *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010).

¶ 65    C.    Child Support, Contribution to Expenses, and Dependent Exemption

¶ 66    Next, Melody contends that the Allocation Judgment is against the manifest weight of the evidence because it requires her to bring Z.W. to Illinois once a month for Kenneth to have parenting time but provides Kenneth with the option to travel to Tennessee to visit Z.W. there. She asserts this is an "absurd result[]," as she is burdened with the cost of bringing Z.W. to Illinois. The trial court's allocation of parenting time is reviewed for whether it is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048 at ¶ 53. Here, the circuit court followed Gelfman's recommendation that Melody bear the cost of bringing Z.W. to Illinois for Kenneth's parenting time here. Given that Melody's request to relocate to Tennessee created the need for Z.W. to travel to Illinois so Kenneth could have parenting time, and Kenneth was required to bear the costs to travel to Tennessee to visit Z.W. there, this decision was supported by the evidence at trial and was not against the manifest weight of the evidence.

¶ 67    Melody next challenges the circuit court's determination of Kenneth's child support. As part of a child custody proceeding, the circuit court may order either or both parents to contribute an amount reasonable and necessary for the support of the child. 750 ILCS 5/505(a) (West 2024). The Illinois Department of Healthcare and Family Services sets forth guidelines and worksheets to aid in the calculation of child support obligations. 750 ILCS 5/505(a)(1) (West 2024). The court computes the basic child support obligation by determining each parent's monthly net income,

adding the parents' monthly net income together, selecting the corresponding appropriate amount set forth in the guidelines based on the parties' combined monthly net income and number of children and then calculating each parent's percentage share of the basic child support obligation. 750 ILCS 5/505(a)(1.5)(A)-(D) (West 2024). There is a rebuttable presumption that the amount of child support that results from applying the guidelines is the correct amount. 750 ILCS 5/505/(a)(3.3) (West 2024). We defer to the factual findings of the circuit court unless they are against the manifest weight of the evidence. *In re Marriage of Moorthy & Arjuna*, 2015 IL App (1st) 132077, ¶ 41. The court's child support award is reviewed for an abuse of discretion. *In re Marriage of Westlund*, 2020 IL App (1st) 190837, ¶ 34.

¶ 68 Kenneth's tax returns from 2021 and 2022 show that he earned $63,932 and $76,477, respectively. Kenneth testified that his annual income at the time of trial was $84,996, which the circuit court accepted as his current income for purposes of child support. Melody's tax returns from 2021, 2022, and 2023 show that she earned $14,955, $33,628, and $23,004 each year, respectively. The circuit court found that Melody's monthly net income was $2,851, based on an October 16, 2024, paycheck she admitted into evidence, which showed she made $1,370.99 bi-weekly. The circuit court concluded, after applying those incomes to the guidelines set by the Illinois Department of Healthcare and Family Services, that Kenneth would pay $937 a month in child support.

¶ 69 Melody asserts that the circuit court erred in calculating both parties' income. She argues that her average income from 2021 to 2024 was $25,414.59. Her paystub dated October 16, 2024, upon which the circuit court based its calculation, states that Melody's pay rate was "1,370.88 Biweekly" and her year-to-date gross income was $29,504.59. We note that, based on the evidence

at trial, Melody's average income over the prior three years varied due to her educational pursuits, health issues, and pregnancy. Given those circumstances, we find no error in the circuit court's calculation of Melody's net income for child support purposes based on her expected income for 2024.

¶ 70 Melody also asserts that the circuit court's findings regarding Kenneth's income were against the manifest weight of the evidence because it did not impute Kenneth's purported self-employment income in his 2021 and 2022 tax returns. Melody fails to cite any authority to support her argument or citations to the record and thus, she forfeited this argument. *Velocity Investments, LLC*, 397 Ill. App. 3d at 297.

¶ 71 Melody also challenges the circuit court's decision to deviate downward from the child support amount upon Kenneth's motion to reconsider, which lowered his obligation from $937 to $713 per month. In deciding whether to deviate from the child support guidelines, a court may consider, among other factors, the financial resources and needs of the parents. 750 ILCS 5/505(a)(2) (West 2024). A party seeking deviation from the guidelines has the burden to demonstrate "compelling reasons" to justify a deviation. *In re Marriage of Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 35. The circuit court's deviation from the guidelines will not be reversed absent an abuse of discretion. *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 28.

¶ 72 In his motion to reconsider, Kenneth argued that a downward deviation of his child support obligation was appropriate due to expenses he would incur to travel to Tennessee to visit Z.W., including flights, hotel rooms, and a rental car. He also argued that Melody relocated in part due to lower living expenses in Tennessee, justifying a lower child support amount for him. Kenneth argued that a downward deviation was in Z.W.'s best interests because it would allow Kenneth to

afford to travel to Tennessee to spend time with Z.W.

¶ 73   The circuit court granted Kenneth's request and issued a written decision specifying the reasons for the deviation, as required by Section 505(3.4).  It found that the guidelines were based on the average expenses to raise a child in Illinois, and that Melody was relocating to Tennessee due to the lower cost of living and increased familial support. The circuit court noted that Melody's financial affidavit identified monthly expenses of $713 related to Z.W. and Melody repeatedly asserted that her living expenses were expected to be reduced in Tennessee, including that she would live rent-free with her mother. The court also noted that Kenneth demonstrated a limited ability to take on the additional travel expenses needed to visit Z.W. in Tennessee. The court found that Kenneth met his burden to show that a downward deviation was appropriate based on the additional travel expenses he would incur to visit Z.W. in Tennessee and Melody's decreased living expenses. After considering Z.W.'s best interests and needs and the financial resources and needs of the parents, the circuit court ordered Kenneth to pay $713 per month in child support.

¶ 74   We first address whether the circuit court could award a downward deviation from the guidelines on Kenneth's motion to reconsider. Melody argues that Kenneth failed to request a downward deviation before or during trial, and therefore, it was improper for the circuit court to entertain his request in his motion to reconsider. "The court may deviate from the child support guidelines if the application would be inequitable, unjust, or inappropriate. Any deviation from the guidelines shall be accompanied by written findings by the court specifying the reasons for the deviation ***." 750 ILCS 5/505(a)(3.4) (West 2024). There is nothing in the text of Section 505 suggesting that the circuit court may only deviate from the guidelines based on a motion filed before trial and Melody cites none. Further, the circuit court found that Kenneth showed a

sufficient basis for the court to reconsider its child support order based on the court's ruling after trial allowing Melody to relocate. Therefore, we reject Melody's argument.

¶ 75 Melody next argues that the circuit court erred in reducing Kenneth's child support obligation without an evidentiary hearing or a showing of a substantial change of circumstances under 750 ILCS 5/510 (West 2024). Kenneth filed his motion to reconsider under Section 2-1203 of the Code of Civil Procedure, which allows a party to file a motion for a rehearing or a modification of the judgment within 30 days of the judgment's entry. 735 ILCS 5/2-1203 (West 2024). Such a motion stays the enforcement of the judgment. *Id.*; *In re Marriage of Simard*, 215 Ill. App. 3d 647, 650 (1991). Thus, there was no final judgment to modify under Section 510. Further, the court did find a change in circumstances necessitating the deviation due to the court's order allowing Melody to relocate with Z.W. to Tennessee, her decreased living expenses and Kenneth's increased travel expenses to see Z.W. Therefore, we reject Melody's argument and find that the circuit court could consider Kenneth's request in a motion to reconsider.

¶ 76 We next consider whether a downward deviation was appropriate in this case. The circuit court considered the increased costs that Kenneth would incur to visit Z.W. in Tennessee, the fact that Melody moved to Tennessee in large part because of reduced living expenses, and that the guidelines were based on the average expenses for raising a child in Illinois. The court cited Melody's financial affidavit that her expenses related to Z.W. were $713 a month and concluded that a downward deviation to that amount was appropriate. The circuit court's decision was based on a proper consideration of the parties' relative expenses given that Melody was allowed to relocate to Tennessee and we find no abuse of discretion.

¶ 77 Melody next contends that, in awarding a downward deviation, the circuit court improperly

considered Kenneth's financial affidavit, which was not admitted at trial. In its order on Melody's second motion to reconsider, the circuit court noted that Kenneth's financial affidavit was not crucial to its findings and that it awarded a downward deviation based on the trial testimony. The court explained that although it referenced Kenneth's financial affidavit in its ruling, that affidavit was "not crucial" to the court's analysis and "it was only one aspect of one factor considered in determining that [Kenneth] met his burden to demonstrate that application of the guidelines would be inappropriate." The court noted that it considered Kenneth's financial resources as he testified to at trial, Kenneth's credible testimony that he could not afford to travel to Tennessee on a regular basis to exercise parenting time with the minor child, Melody's reduced expenses and family support in Tennessee, the lower cost of living in Tennessee, the fact that the guidelines reflect average child-rearing expenditures for Illinois families and the needs of Z.W. identified on Melody's financial affidavit dated December 15, 2023. The circuit court's reasoning for allowing a downward deviation was supported by the evidence admitted at trial and we find no error.

¶ 78   Melody also asserts that the circuit court erred in its award of retroactive child support, both based on the erroneous calculations of the parties' income and the fact that it did not require Kenneth to pay it in a lump sum, instead allowing him to pay $50 per month. The circuit court awarded retroactive support based on the amount set forth in the guidelines of $939 per month because Melody and Z.W. lived in Illinois during the period for which retroactive support was owed. It calculated a total retroactive amount of $17,371.50, and deducted the amount paid by Kenneth of $10,111.36, for a total amount due of $7,260.14. The court found good cause existed to allow Kenneth to pay the retroactive support on a gradual basis.

¶ 79    The circuit court's award of retroactive support is based on the guidelines and the circuit

court's findings regarding the parties' income which we found to be supported by the record. We find no abuse of discretion in its determination of the amount of retroactive support owed. Melody asserts that Kenneth should be required to pay the retroactive child support in a lump sum, but cites no authority to support this argument. We find no abuse of discretion in the circuit court's decision to allow Kenneth to pay retroactive child support on a gradual basis. See *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 1119 (2004).

¶ 80   Next, Melody contends that the circuit court erred in denying her motion to reconsider the parties' contribution towards Z.W.'s uncovered medical expenses and extracurricular activities. In its February 24, 2025, order, the circuit court correctly observed that Kenneth's contribution to out-of-pocket medical expenses was included in his child support obligation. See 750 ILCS 5/505(a)(4)(A) (West 2024). The circuit court found no evidence that Z.W. was enrolled in any extracurricular activities and the Allocation Judgment provided that the parties should share those expenses equally. Given that Melody has primary decision-making over extracurricular activities, we find no abuse of discretion in the circuit court's conclusion that the parties should share the cost equally.

¶ 81   Melody also asserts that the circuit court erred by not ordering Kenneth to contribute to childcare expenses. Section 505(a)(3.7) of the Act affords the circuit court discretion in determining whether to order either parent to contribute to reasonable childcare expenses, in addition to basic child support obligations. 750 ILCS 5/505(a)(3.7) (West 2024). In this case, the circuit court concluded that the evidence at trial was insufficient to establish that Kenneth should be responsible for past childcare expenses. The court found that Kenneth testified credibly that he was never provided any invoices from day care and no evidence of any such childcare expenses

was introduced at trial. The court also noted that, since Melody did not intend on using childcare in Tennessee, there was no need to order Kenneth to contribute to unknown childcare expenses in the future. These findings were supported by the record, and Melody has not shown that this decision was an abuse of discretion.

¶ 82    Melody next argues that the circuit court erred by denying her request that Kenneth maintain a life insurance policy with Z.W. as an irrevocable beneficiary and Melody as the trustee. At the discretion of the court, the court may require a party to obtain life insurance to secure support for the child. 750 ILCS 5/505(a-3) (West 2024). At trial, Kenneth testified that he had a life insurance policy for $750,000, with Z.W. as a 75% beneficiary and his mother as a 25% beneficiary and trustee. Melody points to no authority and makes no argument that Kenneth's current policy is insufficient to provide support for Z.W., other than a conclusory assertion with no citation to evidence that "there is a high likelihood that Kenneth will not make the required or appropriate support payments." In its order on Melody's motion to reconsider, the circuit court held that Kenneth timely paid court-ordered child support and provided for Z.W.'s needs and no evidence was submitted that he would not continue to provide for Z.W.'s needs in the future. We find no abuse of discretion in the circuit court's ruling.

¶ 83    Melody also challenges the circuit court's ruling granting Kenneth's request to claim Z.W. as a dependent on his tax return in alternating years. Typically, the parent with the majority of the parenting time is entitled to claim the dependency exemption for the parties' minor child. 750 ILCS 5/505(a)(3)(C)(I) (West 2024). However, the circuit court has discretion to allocate the tax exemption between the parties. *Stockton v. Oldenburg*, 305 Ill. App. 3d 897, 901 (1999). This decision is reviewed for an abuse of discretion. *Id.*

¶ 84    Melody argues that Kenneth failed to file a motion to request this tax exemption and did not request it at trial, but cites no authority that such a motion was required. Rather, "[t]he allocation of the tax exemption is an element of support, over which a trial court has considerable discretion." *In re Marriage of Fowler*, 197 Ill. App. 3d 95, 100 (1990). The circuit court found it equitable to alternate the tax exemption since Kenneth's child support obligation contributed significantly to the monthly expenses for Z.W. claimed by Melody and because Kenneth was obligated to provide medical insurance for Z.W. These findings were supported by the record, and we find no abuse of discretion.

¶ 85    D.    Contribution to Attorney's Fees

¶ 86    Melody next argues that the circuit court erred by denying her petition for contribution towards her attorney's fees, court reporter costs, and prospective attorney's fees for post-decree work and work on these appeals. The circuit court denied Melody's petition for fees through trial as untimely because she filed her fee petition more than 14 days after the closing of proofs in the trial. See 750 ILCS 5/503(j)(1) (West 2024). The court also found that Melody failed to meet her burden to show that contribution was warranted given that both parties lacked income or substantial assets from which to pay their attorney's fees. The court reserved ruling on the issue of contribution for fees incurred during post-judgment litigation and these appeals.

¶ 87    Because the circuit court did not issue a final order on the issue of post-judgment or appellate attorney fees, we lack jurisdiction to review that issue on appeal. Ill. Sup. Ct. R. 301 (eff. Feb. 1, 1994); Ill. Sup. Ct. R. 303(a)(1) (eff. Jul. 1, 2017). We do have jurisdiction to review the denial of Melody's request for contribution to her attorney's fees incurred through trial because that is a final order for purposes of appeal. See *In re Marriage of Johnson*, 351 Ill. App. 3d 88, 97

(2004).

¶ 88    A party may petition for an award of contribution towards attorney's fees and costs on an interim basis, after a final judgment, and for the enforcement or modification of any order entered under the Act. 750 ILCS 5/501(c-1), 503(j), 508(a) (West 2024). The party seeking contribution must establish their inability to pay and the other party's ability to pay. *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005). A party lacks the ability to pay attorney's fees when requiring payment would strip the party of their means of support or undermine their financial stability. *Id.* A court's decision to award or deny fees will be reversed only if the circuit court abused its discretion. *Id.*

¶ 89 We agree with the circuit court that Melody's petition was untimely. Section 503(j)(1) requires a petition for contribution for fees and costs incurred for a final hearing be filed no later than 14 days after the closing of proofs. 750 ILCS 5/503(j)(1) (West 2024). Melody's argument that there was no final order because the various post-judgment motions tolled the time in which she was required to petition for fees has no basis in Section 503(j)(1), which requires the petition to be filed within 14 days of "the closing of proofs," and not a final judgment. 750 ILCS 5/503(j)(1) (West 2024). The closing of proofs occurred on October 16, 2024, but Melody did not file her petition until February 21, 2025. The circuit court correctly concluded that Melody's petition for contribution to fees incurred through trial was untimely.

¶ 90 Despite its untimeliness, the circuit court addressed Melody's petition on the merits and rejected it. The court observed that both parties lacked assets to pay their respective attorney's fees and that, at the time of the contribution petition, Kenneth was *pro se* and owed his former attorneys over $40,000. The court declined to find that Kenneth had the ability to pay a reasonable amount

of Melody's attorney's fees. This finding is supported by the record. Thus, we find the circuit court did not abuse its discretion in denying Melody's petition for contribution to attorney's fees.

¶ 91    E.    Guardian *Ad Litem*'s Appointment, Fees, and Contempt Finding

¶ 92    Next, Melody argues that the circuit court erred by not voiding all orders related to Gelfman and his fees because the circuit court lacked subject matter jurisdiction over this case. As discussed above, the circuit court did have jurisdiction and we reject her argument.

¶ 93    In the alternative, Melody argues that the circuit court erred by finding that Kenneth's ability to pay Gelfman's fees was "not unlimited," and the allocation of fees was not based on the parties' respective ability to pay. When a guardian *ad litem* is appointed, the circuit court is required to enter an order for their costs, fees, and disbursements, including a retainer. 750 ILCS 5/506(b) (West 2024). The guardian *ad litem* is required to file a detailed invoice for services rendered every 90 days, with copies to each party. *Id.* In allocating the fees of the guardian *ad litem*, the court should consider the financial resources of the parties. *In re Marriage of Kennedy*, 94 Ill. App. 3d 537, 549 (1981). The circuit court's order awarding guardian *ad litem* fees is reviewed for an abuse of discretion. *In re Marriage of Soraparu*, 147 Ill. App. 3d 857, 864 (1986).

¶ 94 After trial, the circuit court found Gelfman's fees to be reasonable after making minor adjustments. The court addressed each party's ability to pay and noted that neither party had unlimited resources with which to pay Gelfman. The court found that, while Kenneth made 65% of the parties' combined income, Melody received significant financial support from her parents, which was not included in her net income. See *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004) (court correctly included, as part of a parent's income, annual gifts he received from his parents). The circuit court ordered Kenneth to pay 55% of Gelfman's fees and Melody 45%. It

noted that Gelfman incurred additional costs because Melody's acceptance into the treatment program at Vanderbilt necessitated an addendum to his report. These findings are supported by the record. We find no abuse of discretion.

¶ 95 Melody next argues the circuit court erred in finding her in indirect civil contempt based on her failure to pay Gelfman's fees, arguing that Gelfman "failed to show where Melody's failure to pay was willful and contemptuous." On September 25, 2024, Gelfman filed a petition for adjudication of indirect civil contempt based on Melody's failure to pay his fees as ordered by the circuit court on June 7, 2024. In her response, Melody admitted that she did not make the payments. She sought a reallocation of Gelfman's fees based on the income disparity between the parties. The court entered and continued Gelfman's petition to trial. After trial, the court found Melody in indirect civil contempt of court for failing to comply with the June 7, 2024, order and set a purge amount of $2,000. The court found that Melody failed to show that her failure to pay was not willful or contumacious given that she was able to procure money to pay her attorneys and a court reporter to attend trial.

¶ 96 Once Gelfman established by a preponderance of the evidence that a violation of the court order occurred, it was Melody's burden to show that her violation was not willful or contumacious or that she had a valid excuse for not following the order. *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17. Whether a party is guilty of contempt is a question of fact for the trial court and we will not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *Id.* Melody cites no such evidence in her briefs and fails to show that the circuit court's order was against the manifest weight of the evidence or an abuse of discretion. Accordingly, we find no error in the circuit court's contempt

finding.

¶ 97    Melody also argues that Gelfman failed to timely file invoices and petitions fees and thus, cannot recover his fees. Although Melody relies on *In re Marriage of Tumminaro and Warlick*, 2013 IL App (2d) 120287-U, that decision is neither precedential nor persuasive.  See Ill. Sup. Ct. R. 23(e) (eff. Jun. 3, 2025).

¶ 98 Section 506(b) requires the GAL to "file with the court within 90 days of his or her appointment, and every subsequent 90-day period thereafter during the course of his or her representation, a detailed invoice for services rendered with a copy" to each party. 750 ILCS 5/506(b) (West 2024). However, this requirement is directory rather than mandatory and a guardian *ad litem*'s failure to submit timely invoices does not preclude an award of fees. *In re Marriage of Susan H.-V. and Bryan V.*, 2024 IL App (3d) 240519-U, ¶ 25[2] ("[N]othing in the provisions [of Section 506] suggest a legislative intent to punish a GAL who fails to submit timely invoices[.]"). We find that the circuit court did not abuse its discretion by awarding fees to Gelfman even if he failed to strictly comply with Section 506(b).

¶ 99    Melody next argues that because Gelfman did not file his fee petitions prior to trial, she was unable to challenge the reasonableness and necessity of the fees, reasonableness of the hourly rate and veracity of his purported efforts. However, the record reflects that Gelfman filed his invoices for services rendered from May to October 2024 and emailed a copy to Melody's counsel on October 29, 2024, shortly after the proofs closed, but before the parties filed their post-trial briefs. Thus, Melody had an opportunity to address these bills before the circuit court ruled on

---

[2] An order entered under Rule 23(b) after January 1, 2021, may be cited for persuasive purposes. Ill. Sup. Ct. R. 23(e)(1).

Gelfman's petition for rule to show cause on November 26, 2024. Additionally, the record reflects the circuit court ordered Melody to pay a portion of Gelfman's fees in 2023. As of June 7, 2024, Melody had made a few payments to Gelfman. Thus, Melody had opportunities to challenge Gelfman's fees, but did not do so. Further, the circuit court reviewed Gelfman's invoices, made some adjustments, excluded some of the fees and found the remainder of the fees to be reasonable and necessary. Thus, we reject her argument.

¶ 100 Melody also argues that because Gelfman did not respond to the "affirmative defenses" she raised in her response to Gelfman's petition for rule to show cause, those affirmative defenses should be deemed admitted. An affirmative defense seeks to defeat the plaintiff's cause of action by a denial or confession and avoidance. *Carmichael v. Union Pacific Railroad Co.*, 2019 IL 123853, ¶ 26. It admits the legal sufficiency of the cause of action, but "'asserts new matter by which the plaintiff's apparent right to recovery is defeated.'" *Reverse Mortgage Funding, LLC v. Catchins*, 2023 IL App (1st) 221197, ¶ 23 (quoting *Vroegh v. J&M Forklift*, 165 Ill. 2d 523, 530 (1995)).

¶ 101 In her "affirmative defenses," Melody merely recited facts and the procedural history of this case. In one sentence, she alleged that "Gelfman represents his hourly trial rate is $500, which is excessive for this case." This is not an affirmative defense—it does not admit the sufficiency of the petition or assert new matter by which Gelfman's apparent right to recover is defeated. Further, this sentence merely argues that his hourly rate is excessive without citing any facts to support it. *See Reverse Mortgage Funding, LLC*, 2023 IL App (1st) 221197 at ¶ 23. Additionally, Melody did not raise this argument in the circuit court and cannot do so for the first time now. *Sheth*, 2013 IL App (1st) 110156 at ¶ 59. Accordingly, we reject Melody's argument.

¶ 102  Melody next asserts that the circuit court's January 13, 2025, order granting her a full fee waiver should be applied retroactively to the $2,000 purge payment on the civil contempt order entered in November 2024. Melody cites no authority for such an argument and thus, it is forfeited. *Velocity Investments, LLC*, 397 Ill. App. 3d at 297. Forfeiture aside, her argument is contradicted by the language of the fee waiver order itself. That order states that Melody's Application for Waiver of Court Fees is granted, "effective on the date the *Application* was first filed." The record reflects that Melody first filed her fee waiver application on January 6, 2025. Thus, the fee waiver order, by its very terms, does not apply retroactively to the November 26, 2024, orders holding her in contempt and requiring her to pay Gelfman's fees. Thus, we reject Melody's argument.

¶ 103  Melody also argues that the circuit court erred by failing to waive the $2,000 appeal bond based on the fee waiver. On January 6, 2025, Melody filed an emergency motion to approve an appeal bond, asking the circuit court to set an appeal bond of $2,000 and stay enforcement of the circuit court's contempt order. The next day, the circuit court granted Melody's motion and set an appeal bond amount of $2,000. Melody then filed a motion to extend the deadline to file the appeal bond and a motion to waive the appeal bond. On February 10, 2025, the circuit court granted Melody's motion for an extension, but did not address her motion to waive the appeal bond. The record reflects that the appeal bond was ultimately paid on Melody's behalf by her father.

¶ 104  A party challenging a money judgment on appeal seeking to stay the judgment must both file a notice of appeal and an appeal bond or other form of security with the circuit court. Ill. Sup. Ct. R. 305(a) (eff. Jul. 1, 2017). The purpose of the appeal bond is to "secure the appellee's judgment while the appellant pursues its appeal." *Inman v. Howe Freightways, Inc.*, 2022 IL App (1st) 210274, ¶ 73. We review the circuit court's approval of an appeal bond for an abuse of

Nos. 1-24-2424, 1-24-2582, 1-25-0309, 1-25-0385 and 1-25-0711 (cons.)

discretion. *Id.* ¶ 98.

¶ 105 Melody specifically asked the circuit court to allow her to post a $2,000 appeal bond and the court granted her request. She cannot now argue that the court erred in doing so. See *Gaffney v. Board of Trustees of Orland Fire Protection Dist.*, 2012 IL 110012, ¶ 33 (invited error rule "prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error."). Further, the record shows that she ultimately posted the bond, and thus, this issue is now moot.

¶ 106 Melody also argues that the circuit court erred by denying her motion to remove Gelfman as guardian *ad litem.* She makes no argument on this issue in her brief, instead adopting her arguments before the circuit court. As Melody has failed to develop this argument, we find that it has been forfeited. *Velocity Investments, LLC*, 397 Ill. App. 3d at 297.

¶ 107   F.        Motion for Sanctions

¶ 108 Melody next contends that the circuit court erred in not holding an evidentiary hearing on her motion for sanctions filed several months after trial against Kenneth and his attorneys. Melody again merely adopts her arguments made in the circuit court and cites no authority for her argument that the court was required to have an evidentiary hearing. Thus, the argument is forfeited. *Vancura*, 238 Ill. 2d at 370.

¶ 109   G.        Melody's Petition for Rule to Show Cause

¶ 110 Lastly, Melody argues that the circuit court erred in failing to hear her first petition for rule to show cause against Kenneth at the trial in October 2024. On April 10, 2025, the circuit court entered and continued Melody's pending petitions for rule to show cause, which is the last order addressing the issue in the record. As the circuit court has yet to issue a final order on Melody's

petitions for rule to show cause, we lack jurisdiction over this issue and dismiss this portion of her

appeal. *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, ¶ 9.

¶ 111   For the foregoing reasons, we affirm the orders of the circuit court and dismiss the portions

of Melody's appeals over which we lack jurisdiction.

¶ 112   No. 1-24-2424, affirmed.
No. 1-24-2582, affirmed.
No. 1-25-0309, affirmed.
No. 1-25-0385, affirmed.
No. 1-25-0711, dismissed in part, affirmed in part.